Mr. Justice James
delivered the opinion of the Court:
The facts out of which this case arises are the following:
On the 10th day of June, 1870, one Gustavus R. Dixon, being the owner of an equitable fee simple interest in lots A, I and K, in square four hundred and ninety-two, and lot thirty-four, in square five hundred and thirty-four., in the city of Washington, conveyed the same to one Joseph Inglehart, his wife, Ada Georgiana Amanda Dixon, joining him in the deed, in trust for the sole and separate use of the said Ada Georgiana Amanda Dixon during her life or widowhood, and, upon her death or re-marriage, whichever should first happen, to convey the same in fee simple to the heirs of the bodies of the said Gustavus and Ada, or, if there should be no such heirs, then to Ida May Campbell, now Ida May Stansbury, complainant in this cause.
In December of the following year, Dixon died childless, and on the 2d day of November, 1874, his widow united herself in marriage with the defendant, William H. Davis; thus, under the terms of the conveyance to Inglehart, entitling the complainant Ida to a conveyance of the property in question.
Prior to the second marriage, however, Mrs. Dixon filed a petition in Equity Cause No. 3334, in this Court, alleging that the improvements upon the lots in question were old and rapidly becoming dilapidated for want of necessary repairs; that a considerable amount of taxes upon the same was due and in arrear, and that the property was liable to be sold therefor; that she was unable, out of the income from the property, to keep up repairs, pay the taxes and support herself; that she was twenty-four years old, while the present complainant was seventeen years of age, so that the probabilities were that her life might continue as long as that *143 of the said Ida; that, for these reasons, she had proposed to the said Ida, and to her parents, a division of the property in fee simple between herself and the said Ida, to which proposition she and her parents had assented, and that no other persons had any interest in said property; wherefore the petition prayed that the Court would order partition of the real estate in question between the petitioner and the said Ida, giving to each the one-half thereof in her own right, in fee simple; or, if that could not be done, that the property might be sold and the proceeds divided between them.
A guardian ad litem for the infant defendant Ida was appointed, herself, her parents, and other witnesses were examined before the auditor upon the question of the advisability of the proposed partition, all of whom testified that it was advisable; lot thirty-four was sold and the proceeds applied to the payment of taxes and the costs of the proceedings; lots I and K were assigned to the present complainant, Ida, and lot A to the petitioner, Mrs. Dixon, in fee simple. It appears from the proceedings before the auditor that the entire arrearage of taxes had accrued subsequent to the death of Gustavus R. Dixon, and, therefore, while it. was incumbent upon the life tenant to pay them. The remarriage of Mrs. Dixon occurred within a few weeks after the conclusion of the proceedings; and it is insisted by the complainants, both in their bill and in the testimony, that the marriage engagement preceded the suit, and that the real object of the latter was to evade and defeat the provisions of the trust deed, under which, if left in force, she 'would lose the entire property when the marriage took place.
The complainant, Ida, having in the meantime contracted marriage with her co-complainant, Charles J. Stansbury, filed her bill in this cause in June, 1881, a little less than four years after attaining her majority, alleging that the proceedings in Equity Cause No. 3334 were void, both for want of jurisdiction over her person, there having been, as she claims, no service of process upon her, and also, and more particularly, for want of jurisdiction over the subject matter, and praying that the property be conveyed to her as provided by the *144 terms of the trust deed. Numerous irregularities in the proceedings were also alleged and relied upon as constituting fatal defects, but, in the view of the cause taken by the court, it is unnecessary here to particularize them. Pending the litigation, Mrs. Davis died; so that both the contingencies have now occurred, upon the happening of either of which the complainant Ida is entitled to the conveyance sought, unless the proceedings in Bquity Cause No. 3334 constitute a valid bar to her claims.
The first question is, whether the court acquired jurisdiction of the person of complainant, as defendant in the cause of Dixon vs. Campbell, No. 3334 in equity.
No writ has been found. The clerk’s docket contains only the following entry: “subpoenas to answer and copies.” Mr. R. J. Meigs, then as now deputy clerk, testifies that he made that entry, and that such an entry indicated, not that subpoenas had been, but were to be issued; and that the word “issued” would, according to his usage, have been added, if they had been so issued. On cross-examination, he said that the probability was that no writ was issued, but that there were exceptional cases where subpoenas were returned served while his docket did not contain the entry of “issued.” Mr. Phillips testified that he was, at the time in question, as at the time of his deposition, deputy marshal; and that the marshal’s docket, produced by him, contains entries of all subpoenas, except those for witnesses; that the title of the cause in question was entered there, but no entry appears of either the receipt or service of subpoenas to answer. When recalled as a witness for the defendant (complainant in No. 3334,) he said that in one case, to which his attention was directed, there was actual service and return of a subpoena to answer, although the marshal’s docket contained no entry of the fact.
The order appointing the guardian ad litem does not state that the infant defendant was present in court, and she now avers that she was not, and this is not traversed.
It seems to us extremely improbable that there was any *145 service of process upon the infant defendant in that case; but as that is a question about which there should be no uncertainty, we are not willing to determine the question of jurisdiction on that ground. We must proceed, therefore, to the question whether the equity court had jurisdiction of the subject matter.
That proceeding was the suit of a life tenant against an infant remainderman, asking for a sale in fee simple of so much of the premises as should suffice to pay the accrued taxes, and to repair the buildings on the unsold residue; and further asking for a partition of such unsold residue between the life tenant and the remainderman. It appears that the whole of the arrears of the taxes had accrued during the petitioner’s own life tenancy; but how far the dilapidation of the buildings had occurred' during the same time does not appear. The fact may not affect the question before us, but it is interesting to observe that about one thousand dollars of the proceeds of the sale made for these alleged purposes, were devoted to the costs and expenses of the proceeding; and that all of the residue was absorbed in the payment of taxes. No repairs appear to have enured to the remainderman.
By the common law the taxes in question, and, so far as they were required by dilapidations occurring during her life estate, the repairs, were charges which'the life tenant herself was to meet. They were not charged by the terms of the trust upon the whole estate; so the burden remained as at common law. Of course, equity had no j urisdiction to apply the estate of one person to the duties of another; in other words, no despotic power to take property from one person and give it to another, without the prefence of an equitable ground for such a transfer. It was necessary, therefore, to show some ground on which the proposed sale and application of proceeds would be for the benefit of the remainderman as well as of the life tenant. The allegations intended to show this were that the life tenant had no means, either out of the rents of the dilapidated buildings or otherwise, sufficient to pay the delinquent taxes and preserve the buildings; and that *146 there was thereby a risk that the fee simple might be sold for the taxes, and, in any case, a risk that the remainderman’s estate might suffer by dilapidation. It was certainly a bold proposition that a part of the remainderman’s estate should be consumed in order to avert a peril which had been caused by the petitioner’s inability to meet her own obligations. That, however, is not the point in question. The court decreed a sale of a part of an infant remainderman’s estate, on the ground that such a sale would, under the circumstances, be for the benefit of the infant. The question is directly presented, therefore, whether it had any jurisdiction so to dispose of her lands. We are of opinion that the court had neither inherent nor statutory jurisdiction for that purpose. We shall consider first the statutes relating to sales of infant’s land.
The Maryland Act of 1785, Ch. 72, Sec. 12, provides that : “ In case any infant * * * hath, or shall hereafter have, a joint interest, or interest in common with any Other person or persons, in equal or unequal proportions, and it shall appear to the chancellor, upon application of any of the parties concerned, and upon appearance of the infant, * * * and hearing and examination of all the circumstances, that it would be for the interest and advantage of the infant * * * and of the other parties or persons concerned, to sell such lands, etc., or any part thereof, the chancellor may order and direct such lands, etc., or any part thereof, to be sold, upon such terms as the chancellor may direct; always taking care that such proportions of the money arising from sale be well and sufficiently secured to be paid to such infant.”
This statue gave the chancellor power to .-sell the lands of infants held jointly or in common, and was only intended to meet the embarrassments of that kind of ownership. In such a case a sale might be ordered, provided it would be for the interest of the infant as well as of the other owners. This was a narrow provision, and operated as a denial of jurisdiction to sell for his own benefit lands owned by an infant otherwise than jointly or in common.
Nor was such jurisdiction given by the act of March 3, *147 1843, which is now embodied in sections 957 to 968 of the Revised Statutes, D. C. That act provides that11 the guardian of an infant may file a bill,” in this court, for the sale of an infant’s real estate, “when he shall think that the interests of his ward will be promoted thereby. ” It regulates carefully the mode of proceeding in such cases ; requiring, among other things, that those who would be heirs of the infant, if he were dead, shall be made parties, and that the infant himself, if over fourteen years old, shall answer in person ; and providing, finally, that, for the purpose of inheritance, the proceeds shall be deemed to be real estate, in case of the infant’s death under twenty-one years of age.
The subject of this statute is the estates of wards and their management by guardians. It gives jurisdiction in aid of the latter, and recognizes the original principle, which forbade the alteration of an infant’s estate, by providing that the proceeds of a sale of his lands shall retain, for the purposes of inheritance, the qualities of real estate. Except upon the petition of a guardian, and in aid of his management, this Court has, by virtue of this statute, no power to dispose of an infant’s lands, whether in possession or remainder.
The proceedings of the Equity Court in No. 3334 did not involve, then, mere error in exercising jurisdiction under these statutes. They were an attempt to exercise a jurisdiction not given by the statutes at all; and were therefore, so far as they depended on these statutes, simply, void. As no other legislative source of jurisdiction to sell an infant’s lands for his own benefit exists, we proceed to' inquire whether equity had an inherent jurisdiction so to dispose of them.
Inasmuch as some American decisions on this subject have assumed that the jurisdiction of the Court of Chancery over the real estate of infants, and its limitations, were determined by considerations which do not apply in this country, we must inquire what the grounds of the English rule actually were. To that end our inquiry becomes historical.
It is known that it was a custom with Edward I, to send certain petitions addressed to him, praying extraordinary *148 remedies, to the Chancellor and Master of the Rolls, or to either alone, directing them to give such remedy as should appear to be consonant “with honesty,” When the Chancellor administered relief independently of the Council, it was by express delegation from the King, and given, as it would seem, by the advice of the Council, i Spence Eq., Jur., 535. Afterwards, in the reign of Edward III, the Court of Chancery appears as a distinct Court for giving relief in cases which required extraordinary remedies. “ The King being, as may well be conceived — looking to the history of his busy reign — unable, from his other avocations, to attend to the numerous petitions .which were presented to him, he, in the twenty-third year of his reign, by a writ or ordinance referred all such matters as were of grace, to be dispatched by the Chancellor. The establishment of the Court of Chancery as a regular Court for administering extraordinary relief, is generally considered to have been mainly attributable to this or some similar ordinance.” 1 Spence Eq. Jur., 337.
Whatever the historical fact may have been, it was inevitable that it should come to be understood that the prerogative power of the King as parens patries, concerning the persons and estates of infants, was included in this delegation. Accordingly, in speaking of the power to appoint guardians, Spence says:
“It is under an assumed delegation from the crown, that it is exercised by the Court of Chancery;” 1 Eq. Jur., 611; and, in speaking of jurisdiction over the estates of infants, he says: “On the whole, it appears, that the authority exercised by the Court of Chancery is more than the execution of a trust, on which it has sometimes been put; and that the authority of the State, which resides in the sovereign, (for such is the effect of attributing the duty of protecting infants to the sovereign in the character of parens patries,) has been deputed to the Court of Chancery, at least in the eye of the law, ” etc. 1 Eq. Jur., 614.
After stating the various theories as to the origin of this jurisdiction, and especially Mr. Hargrave’s position that it *149 was usurped by the Court of Chancery, Story says: “Notwithstanding the objections thus urged against the legitimacy of the origin of the jurisdiction, it is highly probable that it has a just and rightful foundation in the prerogative of the crown flowing from its general power and duty as parens patries, to protect those who have no other lawful protector. It has been well said that it will scarcely be controverted, that in every civilized State such a superintendence and protective power does somewhere exist. If it is not found to exist elsewhere, it seems to be a just inference from the known prerogatives of the crown, as parens patries, in analogous cases, to presume that it vests in the crown. It is no slight confirmation of this inference, that it has been constantly referred to such an origin in all the judicial investigations of the matter,- as well as in the discussions of very learned elementary writers. Assuming, then, that the general care and superintendence of infants did originally vest in the crown, when they had no other guardian, the question by whom, and in what manner, the prerogative should be exercised-, would not seem open to much controversy. Partaking, as it does, more of the nature of a judicial administration of rights and duties in foro conscienties, than of a strict executive authority, it would naturally' follow, ea ratione, that it should be exercised in the Court of Chancery, as a branch of the general jurisdiction originally confided to it. Accordingly, the doctrine now commonly maintained is, that the general superintendence and protective jurisdiction of the Court of Chancery over the persons and property of infants is a delegation of the rights and dtdies of the crown." Story, Eq. Jur., sections 1333, 1334.
The conclusions of these learned commentators are amply supported by the opinions on this subject, delivered by the Commissioners of the Great Seal in the leading case of Eyre vs. Countess of Shaftsbury, 2 P. Wms., 103 Anno 1722 (Hare & Wallace, Lead. Cases); and by Lord Eldon in the celebrated case of Wellesly vs. Duke of Beaufort, 2 Russ., 20, and by Lord Redesdale, on appeal, in the House of Lords. Wellesley vs. Wellesley, 2 Bligh, N. S., 129 to 132.
*150 In Eyre vs. Countess of Shaftsbury, Lord Ch. Gilbert relied upon the following passage of Stanford’s Exposition of the King’s Prerogative, 37. “The King is the protector of all his subjects, and of all their goods, lands, and tenements . and therefore of such as cannot govern themselves, nor order their lands and tenements, his grace (as a father) must take upon him to provide for them, that they themselves and their things maybe preserved.” Upon this he added: “As the King has the protection of infants, I don’t see any other protection can be than by assigning them their guardians ; and where should that protection (meaning of course the King’s protection) be exercised but in that court where care is taken of all persons under natural disabilities ?”
Perhaps, however, the very strongest ground for holding that what is called, the inherent jurisdiction of the court of chancery — as distinguished from what was afterwards given by Parliament — came by delegation of the crown’s jurisdiction, is, that it is a principle of English constitutional law. As Story has said : “ The truth is, that in the constitution of the Government of England all powers in the administration of justice which are necessary in themselves are vested in the crown ; and are so vested to be exercised - by those ministers of the crown to whom the jurisdiction'is usually delegated.” Eq. Jur., Sec. 1349.
In view of this constitutional principle, the original and inherent jurisdiction of the court of chancery is whatever, according to the same constitution, was in the first place vested in the crown. That court thus came to possess, without further grant, the whole of the King’s jurisdiction over the persons and estates of infants.
The final question then, is, what extent of jurisdiction over those subjects did the constitution of England impute to the King himself?
In the first place, it must have been part of the conception of his character of parens patria which made him guardian o f those who could not act for themselves and had no other protector, that he should conserve their status until they could *151 act for themselves. He was himself the head of a system which made land the political and social foundation of its owner’s future. Clearly, in such a case, there was nothing in his imputed function of protector that implied also a power to take that foundation away. This imputed office and duty could not help taking some color from wardship in chivalry, and in that system the very object of the power to educate the infant ward was, that he might be fitted to hold his land. Blackstone says: “The wardship of the body was a consequence of the wardship of the land; for he who enjoyed the infant’s estate was the properest person to educate and maintain him in his infancy; and also, in a political view, the lord was most concerned to give his tenant suitable education, in order to qualify him the better to perform those services which in his maturity he was bound to render.” 2 BL, 68*. When the proper holding of the land was the end to which education was merely a means, it was not likely that the law would impute to the king a discretionary power to alienate the infant’s lands; and that,- too, ip his character of conservator of the estate. There is good historical reason, then, to hold that the King claimed no such power over the lands of infants in his character of parens patries.
In the next place, the practice of parliament shows a common assumption that power to sell an infant’s lands for his own benefit — that is to say, as an act of managing his estate —was purely a legislative power. Cruise has stated a number of examples of /private acts, usually called estate acts, which can be accounted for only on that theory. He observes that these acts were passed where the parties were ‘ ‘not capable of substantiating their agreements without- the aid of the Legislature,” Title 33, Sec. 11, and cites as an example the following: “Where an estate is vested in several persons as coparceners or tenants in common, some of whom are infants, lunatics, or tenants for life; and a fair and just partition is made thereof; a private act may be obtained for confirming such partition, by which infants, lunatics, or remaindermen will be bound.” Title 33, Sec. 18.
In adducing this illustration of the legislative nature of the *152 power, I do not overlook the fact that Equity has claimed jurisdiction in partition on purely equitable principles, and has, on the same ground, dealt to a certain extent with the estates of infants; but it appears that, in doing so, the Courts have disclaimed the power to absolutely bind the infant. “Partition in equity,” said Dord Redesdale, “proceeds upon conveyances to be executed by the parties; and if the parties be not competent to execute conveyances, the partition can not be effectually had.” Whaley vs. Dawson, 2 Sch. & Lefy. 371, 372. To this statement Story adds: “Hence, if the infancy of the parties, or other circumstances, prevent such mutual conveyances, the decree can only extend to make the partition, give possession, and order enjoyment accordingly, until effectual conveyances can be made. If the defect arise from infancy, the infant must have a day, after attaining twenty-one years, to show cause against the decree.” Eq. Jur., sec. 652. The example referred to by Cruise serves very properly, then, to illustrate the position taken by the Degislature, that any absolute disposal of an infant’s lands for his own benefit — or, as we have said, as an act of management of his estate — was a matter of legislative power.
But we have, in addition to this assertion of legislative opinion, the testimony of the Court of Chancery itself. In Taylor vs. Philips, 2 Ves., sec. 23, (Anno. 1750), Dord Chancellor Hardwicke said: “There is no instance of this Court’s binding the inheritance of an infant by any discretionary, act of the Court. As to personal things, as in the composition of debts, it has been done; but never as to the inheritance; for that would be taking on the Court a legislative authority, doing that which is properly the subject of a private bill.” This observation was subsequently approved by Dord Chancellor Hart in Russell vs. Russell, 1 Moll, 525.
Thus the Court of Chancery substantially affirmed two propositions; first, that this discretionary power over the lands of infants never had been a part of the power of the King as parens patries, and therefore could not come to the Court of Chancery by delegation from that source; secondly, that it belonged, by the Constitution of England, to the *153 Legislature, and, as a matter of fact, had not been vested in. the Court of Chancery by Parliament.
These evidences, without more, should be sufficient to-establish the conclusion that this power did not become a part of what is called the inherent j urisdiction of the Court of chancery, in the same manner with the mass of its general jurisdiction. But other evidence is not wanting. In later-decisions, when the question was presented in the ordinary manner, without going into the historical distinctions between the power of the parens patries and the power of the legislature, the courts of equity decided in the same way. In Calvert vs. Godfrey, 6 Beavan, 106, (Anno 1843,) the inherent jurisdiction of the court was considered by Ford Fang-dale, M. R. The question arose on the petition of a purchaser to be relieved of his purchase of an infant’s land sold under an order of the court, on the ground that a good title could not be obtained under such an order. Ford Fangdale said: “The court may order real estate vested in infants tobe sold to satisfy the demands of creditors, or to give to cestuisque tmst the benefit to which they are entitled; but it has no authority to convert the real estate of infants into personalty, or to sell the real estate vested in an infant upon the notion that the conversion or sale-would be beneficial to the infant himself, or to himself and others. * * * From the authorities which were referred to in the argument, it is apparent that if there be jurisdiction to sell, mere irregularities- and errors in the proceedings will not invalidate the sale or prevent a good title from being made under the decree; and in this case I have not thought it necessary to consider several alleged errors in taking the accounts, and calculating the claims on the estate. Such errors, even if proved, would not have availed the petitioner. But if there was no person who had a right to call upon the court to sell the estate for the satisfaction of a claim, then it is clear that in substance as well as in words and form, the sale was ordered only on the ground of its being beneficial to the infant to sell, and I think that this is not within the jurisdiction of the court.”
The case was the more emphatic because Ford Fangdale *154 thought the attempted sale would have been beneficial to the infants.
Referring to these decisions, Mr. Spence says:
“It is completely established that the court can neither give effect to a sale nor exchange of an infant’s real estate, however beneficial to him.” 1 Eq. Jur., 612, note i, citing Calvert vs. Godfrey, supra; Peto vs. Gardiner, 2 Young & C., N. S., 312, and IX Jur., 78.
I am aware that other and later English cases have caused some confusion on this question; but in view of its history and of the leading authorities, there would seem to be no room for doubt. In the language of Mr. Spence, it may be said to be “ completely established ’ ’ that the Court of Chancery has never had general jurisdiction either to sell or exchange an infant’s real estate on the notion that the transaction was beneficial to him.
Whether the doctrine of the English Courts should be adopted in this country, has been the subject of conflicting decisions by our State Courts. It has been followed in New York, Virginia and Missouri; while the Courts of Maryland, Alabama, Georgia and South Carolina have held that equity has an inhei'ent jurisdiction to sell the lands of an infant for his own benefit. Meantime many of the States have enacted laws authorizing their Courts of Equity to exercise such power. While these statutes embody an opinion that Equity should possess that discretionary power, they indicate also an opinion in the minds of the profession that it does not exist without legislative authority.
It has been suggested, however, that the Chancery Court of Maryland possessed this jurisdiction, and that consequently it vested in the Equity Court of this District, as a part of the .body of Maryland law established here by Congress. But it is to be observed, as was pointed out in Thaw vs. Ritchie, 5 Mackey, 203, 204, that no decision asserting that power had been made in Maryland before the year 1800. The earliest was made in 1839, in Dorsey vs. Gilbert, 11 Gill. & J. 87. And even then the general proposition there stated was not *155 relevant to the facts, and had therefore only the weight of a dictum. It was followed, still by dicta, in Dowain vs. Sprecher, 35 Md., 374, and in Long vs. Long, 62 Md., 33. Of course, these decisions are not authoritative evidence that this jurisdiction was part of the law of Maryland at the time of the cession.
On the other hand, we think that Williamson vs. Berry, 8 How., 495, must be construed as showing that the Supreme Court of the United States intended to apply the English doctrine, although the opinion of Mr. Justice Wayne, speaking for the majority of the Court, contains no express declaration on this question.
The facts of that case, so far as they are relevant here, were that one Clark had, by virtue of a private act of the legislature of New York, authority, with the consent of the chancellor, to sell certain lands of his minor children. It was held by the majority that the sale actually made was, nothwithstanding the Chancellor’s decree, a nullity, because the whole proceeding went beyond the authority given by the special act.- This conclusion could not have been reached if the court had been of the opinion that a court of equity had inherent jurisdiction to order a sale of an infant’s lands for his own benefit. The court must, in that case, have held that the chancellor’s order was only, at worst, an erroneous exercise of jurisdiction, and therefore not void. It is important to observe further that Mr. Justice Nelson, speaking also for the Chief Justice, Mr. Justice Catron, distinctly denied, in his dissenting opinion, the existence of an inherent jurisdiction to sell infant’s lands. After stating the power which equity is admitted to possess over the estates of infants, he said : ‘ ‘ They relate to their personal, and to the income of their real estate ; the court having no inherent power to direct a sale of the latter for their maintenance or education; that power vests with the legislature.” Although this opinion is expressly stated only in the dissent, we must infer from the decision that it had the assent of the majority. It may be added that, in matters of equity jurisdiction, there is always a presumption that the courts of the’ United States intend to, follow the court of chancery. On *156 this principle we should have adopted the rule of the latter, even without any decision on the subject by the Supreme Court.
We hold, then, that the equity court had no jurisdiction to order the sale of lot 34, and that the order was void.
Our next inquiry relates to the so called partition of the residue of the real estate. Had the court jurisdiction to make it ?
It would seem to be a sufficient limitation of the jurisdiction of equity in the matter of partition, to say that it is concurrent. Although equity so exercises it as to meet exigencies which would not be considered by the common law courts, and indeed acquired its jurisdiction on the very ground that it could do so, it is, by that origin of its exercise, limited to the same subjects. At common law there was partition of estates in parcenary ; then by the statutes of 31 Henry VIII, Ch. 1, and 32 Henry VIII, Ch. 32, it might be had of joint tenancies and tenancies in common. The enactment of these statutes was a declaration that the judicial power could not force upon the owner of land an alteration of the manner of his enjoyment without express authority from the legislature. Of course, when equity assumed, sometime in the reign of Elizabeth, a concurrent jurisdiction, it made partition only where partition was already authorized ; its jurisdiction was applied only to the associated possessions of parcenary tenancy in common, and joint tenancy. It is true, in dealing with those possessions, “the remedy in equity is not confined to the tenants in possession, but extends to all persons interested, whether presently or in expectation; and remainder-men, reversioners, infants and persons not in esse, may be bound by the decree.” 3 Pomeroy, Eq. Jur., sec. 1387, and cases cited. But in regard to such future possessions, for example, remainders, the proceeding goes upon the principle that, inasmuch as a remainderman is to succeed to what the ’ first taker now has, his succession may be defined at once and restricted to possession of the first taker’s part as now set off. It is considered that the nature and quantity of his *157 right are not thereby altered; his right is merely located. In this way, partition is in effect made between the remainder-man of one portion of the land and the tenant of another. But the courts of equity have never imagined that under the name of partition, and, under pretence of allotting to each estate its full share in severalty, they could divide the land between the first taker and his own remainderman; in other words, that they could take from one of the parties in interest a part of his estate and transfer it to another.
But this is precisely what the decree in question attempted to do. Instead of her remainder in the whole of the premises, it gave to the infant an estate in possession in one-half thereof, and to the life tenant of the whole of the premises it gave an estate in fee simple in one-half, And in this particular instance still another principle was disregarded. We have-seen that the Court had no jurisdiction either to exchange or to sell an infant’s lands on the ground that it would be for his own advantage to do so; but the Court undertook to make such an exchange on that ground. Its decree directed an exchange of an estate in remainder in the whole for a different estate in one-half of the premises. It had neither inherent nor statutory power to do so.
It is set up, however, in the answers to the present bill, and was urged at the argument, that the decree was binding on the infant defendant because of her own consent and that of her guardian ad litem, and because a court of equity has power to ratify by its decree a compromise between parties. The contention seems to be that, whether regarded as acts of the Court or as a transaction inter partes, the partition, and the sale made in order to effect it, became valid in this way.
As judicial acts they could not be validated by consent of parties, unless parties can give jurisdiction over the subject matter; and it is hardly necessary to spend time in showing that they cannot take the place of the legislature. As the Supreme Court said in C. & L. M. Railway Co. vs. Swan, 111, U. S., 379, “Judicial power must not be exerted in a *158 case to which it does not extend, even if both parties desire to have it exerted. This objection stands also in the way of the contention that the court has the power to enter a compromise decree; it cari do so only when.it has jurisdiction of' the subject.
Nor is there any principle on which the partition and sale can be held binding as a transaction inter partes. Even if a deed of conveyance had been made by the infant defendant, in conformity with the original practice of equity in making partition, the infant defendant could disaffirm her act on attaining her majority. But here we have no conveyance by the infant, and the contention must be that her assent to the action of the court operated by way of equitable estoppel. This principle is not applied to the acts of infants. It may be invoked by one who has a right to say that he had relied, and had a right to rely, on the conduct of the other party; but whoever enters into any transaction whose validity depends upon the consent of an infant, does so with knowledge that the latter has an unrestricted right to disaffirm at will after he attains his majority. Even fraud will not forfeit this protection. “In many cases,” said the Supreme Court, in Tucker vs. Moreland, 77 Peters, 77, “the disaffirmance of a deed made during infancy, is a fraud upon the other party. But this has never been held sufficient to avoid the disaffirmance; for it would otherwise take away the very protection which the law intends to throw around him to guard him from the effects of his folly. In Sanderson vs. Marr, 1 H. Bl., 75, it was held that a warrant of attorney given by an infant, although there appeared circumstances of fraud on his part, was utterly void, even though the application was made to the equity side of the court to set aside the judgment founded on it,” etc.
Our conclusion is, that the proceedings of the equity court, both in selling lot 34 for the benefit of the rest of the estate, and in making partition of the residue between the life tenant and the remainderman, were wholly without jurisdiction and were therefore void. It follows that the purchasers at these so-called judicial sales acquired no title by their purchases.
*159 The principle on which the validity of judicial sales is maintained, notwithstanding any errors in the proceedings, in cases where the Court had power to order the sale, has no application where it had no jurisdiction to touch the matter at all. The common welfare requires that the work of a tribunal which was authorized to deal with a matter, should be protected against a re-examination which aims simply to defeat its function, instead of furthering it by correcting its errors. But there is no public policy that an unauthorized meddling should be protected at all. When a Court has no jurisdiction, its whole proceeding, from hearing of judgment and consequent sale, is coram non judice; in contemplation of law the person who purports to render judgment is not a judge, and the sale ordered by him is not a judicial sale. It is actually against public policy that any right §hould by him be taken away from a party with whom he has no concern, and therefore that any right should be acquired by his unauthorized act. The -test begins with the right of the party deprived; from that results the want of right in the party acquiring.
There seems to be a not uncommon impression that the certainty of title got by judicial sale rests chiefly on the doctrine of innocent purchaser; we conceive that it rests upon the more public principle that jurisdiction shall amount to jurisdiction, and that its work shall be considered to be done when it is done. But whatever weight may be given to the private right of the purchaser when, the sale was ordered by one who had power to make the order, a purchaser at an unauthorized sale has not an equity that is superior to that of the original owner. The equity of the latter to keep his own without disturbance, until some authorized power shall take it from him, is both earlier in time and higher in right. In contemplation of law it is no hardship on one who volunteers to purchase, that he must take at least this risk. It is one that is incurred wherever power to act is in question.
These principles have been affirmed both by the English and American courts. In Calvert vs. Godfrey, 6 Beavan, *160 106, referred to supra, the Master of the Rolls refused to •compel a purchaser to perfect his purchase, on the ground that he would not get a good title-, inasmuch as there had been no jurisdiction to order the sale. In Williamson vs. Berry, 8 Howard, 495, the Supreme Court allowed a recovery in ejectment on the ground that a purchaser at a sale made without jurisdiction had acquired no title. See also Voorhees vs. Bank U. S., 10 Peters, 474, 475, 477 and 478; Baker vs. Lorillard, 4 New York, 257; Rorer on Judicial Sales, 171, 172; and Freeman on Void Judicial Sales. Rorer says, page 171 : “Judicial sales are not affected in collateral proceedings by mere irregularity. Objections of this description must be made by appeal. It is the policy of the law to .uphold and enforce the proceedings of the courts when jurisdiction has attached, and especially sales by the court itself to bona fide purchasers. But if jurisdiction is wanting in the court making them, they are absolutely void.” And Freeman says, page 3 : “If the order or judgment on which a sale was made was one resulting from a controversy which - the court had, in no circumstances, any power to determine, there was no jurisdiction over the subject matter, and the sale was incurably void.”
We hold, then, that the purchasers at the sales now in question acquired no title ; or rather, to state the matter more according to principle, that the rights of the complainant were not adjudicated or in any way determined or affected by the decree in Equity Cause 3334.
But it is finally objected that, however clear the complainant’s right to recover may have been when she attained her majority, sh'e has lost by laches her right to have relief in a court of equity.
The original bill in this cause was filed in less than four years after the complainant attained her majority. It referred to only a part of the property included in the amended bill, but the validity of the proceedings upon which the titles of all the defendants depended, was attacked. It is claimed, however, on the part of the new defendants, that, even if *161 laches were not imputable when the original bill was filed; they were imputable by reason of the further lapse of time' when the amendment was filed. An analogous objection would be good in an action at law. When a wholly new cause of action is presented by amendment after the statute of limitations had run, it is enforced at law; but it does not follow that equity should apply the same strictness to the subject of laches. I have not found-any precedent for such severity. Nevertheless, both periods will be considered in reference to the lapse of time.
Courts of equity have considered the question of laches in a great variety of circumstances, and everywhere they have said that its determination must depend, in each case, upon the circumstances of that case. Stearns vs. Page, 7 How., 829; Harwood vs. R. R., 17 Wall., 81; Sullivan vs. Portland, R. R., 94 U. S., 806; Brown vs. County of Buena Vista, 94 U. S., 618. In some cases they have accordingly granted relief long after the statute of limitations in analogous cases at law had expired; in others they have denied relief when less than the statute time had run. Their language has implied sometimes almost a pretension of “grace” in overlooking delay; as if the chancellor was still the delegate and representative of the King. But that element has disappeared from the administration of equity even in England; and in this country it was eliminated when all judicial power, as well in equity as at law, was made to originate in constitutional or legislative grant. With us the administration of equity is simply a question of rights and duty. Even the chancellor’s “conscience,” which he is still fond of mentioning, is an anachronism; his action is governed by principles, applied by his intelligence. There is no uncertainty about the considerations which determine the effect of time, no room for judicial impatience, no authority to consider whether four or five or seven years of waiting are about enough to endure. A petitioner has or has not a right to the relief he asks, and whether he has is to be determined by perfectly ascertained considerations.
It(is to be gathered from the authorities that equity acts *162 upon two general considerations as to lapse of time. One of them has reference to the interests of the community, the other to the particular interests of individuals. The first takes account of mere lapse of time, and enforces, on behalf of society, the policy of repose; the other takes account of the effect of a complainant’s delay on the rights of individuals.
As to the policy of repose, the question of public interest, equity seems to have taken the following' view: The omission of the legislature to include suits in equity in the statutes of limitation was of course intentional; it was contemplated that equity should apply its own peculiar considerations to the subject of those statutes. If the circumstances of a particular case should show that, even before the time allowed in analogous cases at law had elapsed, time had brought about conditions which made it inequitable to grant relief, equity was free to act .upon that consideration, and to refuse relief, notwithstanding it would be granted in an analogous case at law. On the other hand, if the circumstances of a particular case should show that, although more time had elapsed than was allowed in analogous cases at law, the delay was not imputable to the fault of the petitioner, then equity was free to apply that consideration, and to grant relief notwithstanding it would be denied in an analogous case at law, ■ In such a case, equity might decline to apply the general policy of repose, on the ground that it would be inequitable to do so. Finally, where the rights of parties had not been varied by lapse of time, and were ascertainable — in other words, where only lapse of time was to be considered — the courts of equity had no considerations to apply to that subject which were not equally applicable to actions at law. In that case the public policy of repose was the only matter to be considered, and as to that single consideration the courts of equity were bound, just as much as were the courts of law, by the declaration of legislative opinion. It is then their duty to apply the statute of limitations.
*163 This last proposition seems to have been recognized chiefly when the equity courts applied the statute limit to cut off litigation; but in principle it is equally applicable in allowing litigation and relief during the whole period of the limitation. It is not easy to perceive any reason why the “repose of society” or the “quieting of men’s titles” should require an arrest of litigation earlier in one kind of court than in another. As to that matter the judgment of the legislature should be the paramount rule in both. So long as society permits litigation at all about a matter, it hardly becomes a particular class of its tribunals to say that the interests of that society forbid any litigious disturbance.
Moreover, this principle has been recognized by the courts. In every instance in which the Supreme Court has denied relief within the time of the statute, the court has pointed out that the rights of parties had already varied by the lapse of time. This was equivalent to a declaration that, but for such variation, the statute limitation would be adopted so as to allow the use of the whole of the time limited. See Baker vs. Whiting, 3 Sumn., 476 (486), and the remarks of Mr. Justice Harlan in Sullivan vs. Portland R. R., 94 U. S., 806.
In the case before us, the analogy is to an action of ejectment, and on the principle above stated the mere lapse of time, less than the statute limit, is not denounced by public policy, and is, therefore, not to be treated as laches by a court of equity. The authorities by which this court is controlled do not show that such a lapse is to be treated as in itself laches; they spend their whole force in demonstrating that less time than the statute allows, may, and in the particular case has, so varied the rights of parties, that relief cannot equitably be afforded. Within that limit, the question is, whether cirmmstances, • arising from lapse of time, have taken away the right to equitable relief.
The next question, then, is, whether there are grounds peculiar to this case, on which relief should be denied to this petitioner.
*164 We think, in the first place, that she has done nothing to confirm the titles of the defendants. In Tucker vs. Moreland, 10 Pet., 75, 76, the Supreme Court declared that mere acquiescence for a time, although accompanied by a voluntary and deliberate recognition, after arrival at majority, would not preclude an avoidance of a conveyance made during nonage. ‘ ‘Admitting, ’ ’ said the Court, ‘ ‘ that acts in pais may amount to a confirmation of a deed, still we are of opinion that those acts should be of such a solemn and unequivocal nature as to establish a clear intention to confirm a deed after a full knowledge that it was voidable. A fortiori mere acts of acquiescence, uncoupled with any acts demonstrative of an intent to confirm the deed after full knowledge that it was voidable, would not be sufficient for the purpose. In Jackson vs. Carpenter, 11 Johns. R. 542, 543, the court held that an acquiescence by the grantor in a conveyance made during his infancy, for eleven years after he came of age, did not amount to a confirmation of that conveyance; that some positive act was necessary, evincing his assent to the conveyance. In Austin vs. Patton, 11 Searg. & Rawle, 311, the court held that in order to constitute a confirmation of a conveyance or a contract by an infant, after he arrives at full age, there must be some distinct act, by which he either receives a distinct benefit from the contract after he arrives at age, or does some act of express ratification. There is much good sense in these decisions, and they are indispensable to a just support of the rights of infants according to the common law.”
In Boody vs. McKinney, 23 Maine, 523, 524, the court said: ‘ ‘ There must be some positive and clear act performed for that purpose. The reason is, that by his silent acquiescence he occasions no injury to other persons, and secures no benefits or new rights to himself. There is nothing to urge him, as a duty towards others, to act speedily, language appropriate in other cases, requiring him to act within a reasonable time, would be inappropriate here.”
Certainly, the purchasers at the so-called judicial sales cannot claim that they were induced by the laches of the com *165 plainant to alter their condition; their purchases were made while she was yet an infant, and before the alleged delay in seeking relief could begin.- Their titles-have not been confirmed, for she made no conveyance which could be confirmed, and she has done no act which would confirm a conveyance.
Their titles are not protected by estoppel, for, although acquiescence in what is about to be done may work estoppel, acquiescence in what has been done has no such effect; and the complainant has done nothing more than submit to a past act, except when she purported to assent to a decree for the sale of her lands, and was simply incapable to do so. As to other grounds for imputing laches, no evidence has been, or can have been lost, no accounts were to be taken when this bill was filed, and none of the parties had died. In short, we do not perceive that this case presents any one of the circumstances which sometimes induce courts of equity to hold a complainant barred by a shorter lapse of time than the period of limitation at law.