**Surur FATUMABAHIRTU
and Shahzad Aslam,
Appellants,**

**v.**

**UNITED STATES, Appellee.**

**Nos. 08–CM–314, 08–CM–781.**

District of Columbia Court of Appeals.

Argued June 3, 2010.[1]

Decided Aug. 11, 2011.

---

1. The appeals of Ms. Fatumabahirtu and Mr. Aslam were placed on the Summary Calendar. The court granted Ms. Fatumabahirtu's request for oral argument. Mr. Aslam did not request oral argument and his case was submitted without oral argument.

Jeffrey L. Light, Washington, DC, appointed by the court, for appellant Surur Fatumabahirtu.

Steven Kiersh, Washington, DC, appointed by the court, filed a brief, for appellant Shahzad Aslam.

Keith A. Becker, Assistant United States Attorney, with whom Channing D. Phillips, Acting United States Attorney at the time the brief was filed, and Roy W. McLeese III and Elizabeth Trosman, Assistant United States Attorneys, were on the brief, for appellee.

Before OBERLY, Associate Judge, REID,[2] Associate Judge, Retired, and STEADMAN, Senior Judge.

REID, Associate Judge, Retired:

These appeals involve a matter of first impression requiring an interpretation of a subsection of the District of Columbia Drug Paraphernalia Act of 1982 ("DPA"), D.C.Code § 48–1103(b) (2001).[3] After the government gave notice of its intent to proceed on the lesser-included charge of "[a]ttempted [p]ossession of [d]rug [p]araphernalia with [i]ntent to [s]ell" instead of the charged offense, the trial court found appellants, Surur Fatumabahirtu and Shahzad Aslam, guilty of attempted sale of drug paraphernalia. Ms. Fatumabahirtu contends that the DPA contains both an intent and a knowledge element, and that the government failed to present evidence on these elements sufficient to convict her beyond a reasonable doubt. Mr. Aslam asserts that the government failed to present evidence sufficient to prove the knowledge element of the statute beyond a reasonable doubt, and that the statute is unconstitutionally vague.

**2.** Judge Reid was an Associate Judge of the court at the time the case was argued. Her status changed to Associate Judge, Retired, on April 7, 2011.

**3.** D.C.Code § 48–1103(b) (2001) provides:

(b) It is unlawful for any person to deliver or sell, possess with intent to deliver or sell, or manufacture with intent to deliver or sell drug paraphernalia, knowingly, or under circumstances where one reasonably should know, that it will be used to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance. Whoever violates this subsection shall be imprisoned for not more than 6 months or fined for not more than $1,000, or both, unless the violation occurs after the person has been convicted in the District of Columbia of a violation of this chapter, in which case the person shall be imprisoned for not more than 2 years, or fined not more than $5,000, or both.

We hold that D.C.Code § 48–1103(b) requires the government to prove that an owner or a clerk of a commercial retail store had (1) the specific intent to deliver or sell drug paraphernalia (as .defined in D.C.Code § 48–1101(3)), and (2) knew, or reasonably should have known, that the buyer of the items would use them illegally to inject, ingest, or inhale a controlled substance. We further hold that in our jurisdiction both the specific intent and knowledge requirements of D.C.Code § 48–1103(b) are satisfied by credible and compelling direct, indirect, or circumstantial evidence that, at the time of the sale, the owner or clerk of a retail establishment had knowledge or reasonably should have known that the buyer would use the items sold together (here a glass ink pen and a copper scouring pad) to inject, ingest or inhale a controlled substance. In addition, we hold that as construed in this opinion, the DPA is not unconstitutionally vague. Finally, we conclude that the government presented credible, strong, and compelling indirect and circumstantial evidence to convict Ms. Fatumabahirtu and Mr. Aslam of attempted sale of drug paraphernalia; and thus for the reasons stated in this opinion, the trial court properly convicted them of that charge.

## FACTUAL SUMMARY

The record shows that by information, dated July 20, 2007, the government charged Ms. Fatumabahirtu and Mr. Aslam with a violation of D.C.Code § 48–1103(b). Specifically, the information alleged that:

On or about July 6, 2007, within the District of Columbia, [Ms.] Fatumabahirtu [and Mr.] Aslam did unlawfully, knowingly and intentionally have in [their] possession drug paraphernalia, that is, items to use and sell drugs with the intent to deliver and sell the said items to use and sell drugs and under circumstances where [they] should reasonably know that the said items to use and sell drugs would be used to introduce a controlled substance into the human body.

On November 2, 2007, the government notified appellants that it intended to proceed on the lesser-included charge of attempted possession of drug paraphernalia with intent to sell.[4]

The government presented the testimony of three fact witnesses (officers of the Metropolitan Police Department ("MPD")), and one narcotics expert (an MPD detective). During the hearing on Mr. Aslam's motion to suppress evidence under the Fourth Amendment,[5] Officer Jose Garcia, who had received training relating to drug paraphernalia, and who had made ten prior drug paraphernalia arrests, testified that on the night of June 28, 2007, his undercover activity took him to stores and gas stations located on Georgia Avenue, in the Northwest quadrant of the District of Columbia. He entered a gas station store in the 7600 block of Georgia Avenue and asked for "[w]hat they call an ink pen." He described the "ink pen" as one that did not write but which could be used "like a pipe" for ingesting crack cocaine when taken apart. In response to the question as to

4. D.C.Code § 22–1803 concerns attempts to commit a crime, and provides in pertinent part:
 Whoever shall attempt to commit any crime, which attempt is not otherwise made punishable by chapter 19 of An Act to establish a code of law for the District of Colum-

bia, approved March 3, 1901 (31 Stat. 1321), shall be punished by a fine not exceeding $1,000 or by imprisonment for not more than 180 days, or both.

5. Ms. Fatumabahirtu did not file a motion to suppress evidence.

whether the ink pen was "something that could ever write," Officer Garcia said, "No sir." He also confirmed that there was no ink in the pen. The store clerk, later identified as Ms. Fatumabahirtu, gave him a "metal scrubber[ ]" in addition to the ink pen. Both items were packaged "in a little bag"; Officer Garcia paid $4.00 for the bag. After making the purchase, the officer exited the store and informed the arrest team. Officer Garcia made an in-court identification of Ms. Fatumabahirtu as the person who sold him the pen and scrubber. On cross-examination by counsel for Mr. Aslam, Officer Garcia acknowledged that he did not test the ink pen to see whether it could write.

After Officer Garcia's purchase, MPD sought and received a warrant to search "the entire premises" of the store. The search, which took place on July 6, 2007, produced alleged drug paraphernalia from three separate areas of the store, including the place used for storing merchandise. Mr. Aslam contended that the affidavit in support of the government's application for a search warrant was "overbroad and lacking in specificity," and hence, "the fruits of the warrant should be suppressed." The trial court denied Mr. Aslam's motion to suppress, saying in part: "I don't find the affidavit to be defective, nor [Officer Garcia's] testimony to be inherently incredible such that ... nobody would believe that what he's saying would amount to probable cause to have a warrant issued to go search the place."

The trial judge incorporated Officer Garcia's direct testimony into the trial proceeding, but allowed defense counsel to pose additional questions on cross-examination. Counsel for Ms. Fatumabahirtu established that the undercover officer was separated from Ms. Fatumabahirtu by glass at the time of his purchase, and that she placed the separate items (the pen and the scrubber) in the bag.

Officer Ramey Kyle was part of the search team that executed the search warrant at the store; Ms. Fatumabahirtu was present during the search. Officer Kyle located several items which were seized, including two boxes of copper scouring pads, digital scales, and small, empty ziplock bags. Based on his training and experience, Officer Kyle believed that the scouring pads, the digital scales, and the empty ziplock bags could be used as drug paraphernalia. All of the items, except for the ziplock bags "were in a back storeroom"; the bags were found "in a cabinet underneath the cash register." While the search was underway, Mr. Aslam, the manager of the site, arrived. Officer Kyle made an in-court identification of Mr. Aslam, and also identified photographs (taken at the store) of business licenses in Mr. Aslam's name.

Another officer who participated in the execution of the search warrant was Jeff Janczyk; he had been trained in the identification of drug activity and drug paraphernalia, and had participated, with other officers, in "approximately a thousand arrests." The majority of these arrests were for drug paraphernalia. He identified Ms. Fatumabahirtu as the person who was behind the counter when the search warrant was executed, and Mr. Aslam as a person who entered the store during the search. Officer Janczyk located "a box of glass pens behind the counter," scouring pads "in a front area above the counter," and Mr. Aslam's business license bearing a photograph of him. In response to questions by Mr. Aslam's counsel, Officer Janczyk said he believed that the pens in the box recovered from the store could write but he did not agree that they were "not hollowed out." Ms. Fatumabahirtu's counsel stated that "[t]he pens ... [that Officer

Janczyk] located … at that point … were not capable of being used … as drug paraphernalia…." Officer Janczyk responded, in part: "Typically, someone would take the scouring pad—and put it in the pen. That would make it drug paraphernalia." He added: "That's typically what we see when we arrest someone and recover drug paraphernalia off of them."

The officer who actually seized the items from the store during execution of the warrant was Officer Jennifer Jamieson. On direct examination, she was asked to open one of the boxes seized from the store and to describe what she saw. She stated that the box contained about twenty-five boxes of "glass ball pens," and that in each closed or sealed box there were about thirty-six pens. Government counsel asked Officer Jamieson to "try to write" with the pen on a clean piece of paper. She answered "yes" to government counsel's question, "were you able to write on that piece of paper?" Officer Jamieson identified other items seized, including a Coke can that was hollow inside, five or six digital scales, and invoices showing items shipped to Mr. Aslam from a company in Baltimore. Officer Jamieson admitted that Ms. Fatumabahirtu's name did not appear on the invoices.

Detective Rene Dessin testified as the government's narcotics expert. He explained that the "pen-type object" was used as a pipe for smoking crack cocaine. The glass part of the object is "use[d] … as a pipe, glass pipe," the pen is taken out, a strand of coil from the scouring pad is inserted in the glass tube to act as a coil, it is "burn[ed]" or "heat[ed]," used, and the pen part serves as a "push rod." He indicated that the inner, pen-part of the object was not "full to the top with ink" because "the white part would be dark with ink in it."

Following the government's case-in-chief, counsel for Mr. Aslam moved for judgment of acquittal on the ground that the government "ha[d] not met the elements" of the statute; he specifically focused on the knowledge element. During the discussion of the elements, the trial judge indicated that the statute is "a general intent statute, not a specific intent statute." Mr. Aslam's counsel argued that the government had "to establish a mens rea" but had failed to show "intent" or "knowledge." The judge determined that the evidence was sufficient at that point to deny the motion for judgment of acquittal.

Both Mr. Aslam and Ms. Fatumabahirtu testified for the defense. Mr. Aslam stated that he has owned the gas station and mini-mart business in the 7600 block of Georgia Avenue for nine years. He answered "No, sir" to the question: "Do you have any knowledge of illegal activity occurring on your property?" He acknowledged on cross-examination by the prosecutor that: Ms. Fatumabahirtu had been employed in his store; he goes to the premises "on a daily basis; and he orders items sold in his mini-mart, including those seized by the government and introduced into evidence. He agreed that some of the items seized were in his storeroom; some "were located behind the [cash] register area"; and some of the glass pens and scouring pads were "sitting out for display where the customers can see them." He admitted that he "wouldn't order pens where the ink fountain in the pen was almost empty."

Ms. Fatumabahirtu's testimony revealed that she has been in the United States since 2006, and she started working as a cashier for Mr. Aslam in April 2007, initially twice a week and then once a week. She did not select items for sale in the mini-mart; nor did she decide where to place the items. Those decisions were made by

Mr. Aslam. She acknowledged that she sold pens at the mini-mart, but she did not see anything "unusual or remarkable about those pens. . . ." She also sold the copper scouring pads, saw nothing "unusual or remarkable about [them] . . ." and commented that they were used to "wash pots[,] [k]itchen pots." When asked whether she had "ever sold a copper scrubber and a pen to any customer," she replied: "I do not recall. Maybe once or twice, but I don't have a recollection of it." She claimed that the term "the works" did not mean anything to her. When asked whether a customer had ever come into the store to buy just an ink pen, she replied "yes," that she "remember[ed] selling a pen, but [she did not] have a recollection how many times [she] did that." She identified photographs depicting items for sale and on display at the time the police executed the search warrant; these items included groceries, cigarettes, lotto tickets, a "hiding can," t-shirts, and phone cards. She does not smoke cocaine, and has "no idea" of the objects used to smoke cocaine. On cross-examination by the prosecutor, Ms. Fatumabahirtu agreed that she spoke "a little bit of English" and "underst[oo]d the word ink pen." She stated that she had been working at the mini-mart "about 12, 14 days" prior to July 6, 2007.

In announcing its findings, the trial court concentrated on the knowledge element of the statute, Ms. Fatumabahirtu and the undercover officer to whom she sold the items in question. The trial court credited the officer's testimony and essentially believed that Ms. Fatumabahirtu was guilty as charged because when the officer asked for an ink pen, she not only sold him the pen but also a scrubber. As the trial judge said, in part:

> The question is whether one believes that when [the officer] asked the lady for an ink pen, she in fact, went and got this thing right here [a pen that was

introduced into evidence], and this scrubber.

> And I don't disbelieve what [the officer] says. I credit that when he asked for an ink pen, she thought he was one of those drug boys, and she gave him this pen right here, and she gave him this scrubber right here.

> And there would be no reason to give the man the scrubber if all he asked for was an ink pen, so it is my opinion that she knew or thought that he was looking for an ink pen and a scrubber so he could smoke some drugs, and that these things were on sale for just that purpose, that's not to say that's the only purpose that the items could be used for.

> But whether you say she actually knew, even if she didn't actually know, she had reason to know, otherwise she would have never sold him [the scrubber] if he asked for an ink pen, in that context.

The trial court found both Mr. Aslam and Ms. Fatumabahirtu guilty, and further reasoned, again concentrating on the knowledge element of the statute:

> [H]e's ordering the stuff. She's not ordering it. He knows what it could be sold for. He's in the store on a daily basis. There's nothing going on in that store that he doesn't know about, and you're saying, "Well, she's been here too recently to even know anything about it," well, then that implies that somebody in the store must have told her what to do with these items and how to price them and under what circumstances to sell them, and the only one who would be in a position to do that is the owner of the store, since he's buying the merchandise.

## ANALYSIS

### Arguments of the Parties

Both Ms. Fatumabahirtu and Mr. Aslam challenge the sufficiency of the evidence and their convictions under the DPA. Ms. Fatumabahirtu asserts that the DPA "imposes both a knowledge and an intent requirement." She argues that she "sold an undercover officer two items which may be used as drug paraphernalia, but because she had neither the requisite knowledge nor intent, her actions were not criminal and her conviction should be reversed." She contends that "[t]he government failed to introduce evidence that the objects sold by [her] were used, intended for use, or designed for use with controlled substances and therefore there was insufficient evidence to convict." She maintains that she "has never smoked cocaine," and "she was new to the country, spoke little English, and was not familiar with the various and sundry ways that crack pipes are made in the District." In addition, she claims that her conviction should be reversed because of an alleged fatal variance between the original charge and the evidence presented at trial.

Mr. Aslam argues that "[t]he government did not establish that [he] knew or reasonably should have known that the items sold from his store would be used to ingest an illegal substance." He claims that D.C.Code § 48–1103 is "unconstitutionally vague," and that "[i]n the event that there is ambiguity concerning the meaning of the operative provisions of a statute, the [r]ule of [l]enity mandates that construction of the statute be in favor of the defendant."

The government insists that "[v]iewing the evidence in the light most favorable to the government, with all reasonable inferences drawn from the facts, there is strong circumstantial evidence in this case from which a rational trier of fact could find, beyond a reasonable doubt, that [Ms. Fatumabahirtu and Mr. Aslam] knew or reasonably should have known that the items sold would be used to prepare, pack, store, contain or introduce into the human body a controlled substance." Moreover, the government, in agreement with the trial court, maintains that Ms. Fatumabahirtu's conduct in selling the undercover officer both the requested glass ink pen and the scrubber, which the officer did not request, "was strong evidence that [she] either knew or had reason to know of the illicit use to which such item would be put." In addition, the government asserts that Mr. Aslam trained Ms. Fatumabahirtu and the fact "that a recent immigrant knew to include a scouring pad with the purchase of a glass pen, and what to charge for the two items, provides strong evidence of both appellants' knowledge." Moreover, like the trial court, the government believes that the sale of a glass pen and the act of hiding those items (in addition to the digital scales and small ziplock bags) from public view implies not only that the items were not "intended for innocent purposes" but also that the act of selling and concealment "provided further evidence of appellants' scienter in this case." During oral argument, the government took the position that the DPA is not a specific intent statute.

"We view the evidence in the light most favorable to the government, recognizing the province of the trier of fact to weigh the evidence, determine the credibility of the witnesses and to draw reasonable inferences from the testimony." *Dickerson v. United States,* 650 A.2d 680, 683 (D.C.1994). "In reviewing a bench trial, we will not reverse unless appellant establish[es] that the trial court's factual findings are plainly wrong, or without evidence to support them." *Price v. United States,* 985 A.2d 434, 436 (D.C.2009) (alter-

ation in original) (internal quotation marks and citation omitted). "Therefore, in order to prevail, appellant must establish that the government presented no evidence upon which a reasonable mind could find guilt beyond a reasonable doubt." *Id.* (internal quotation marks and citation omitted). However, "to establish the charges against the defendant, the prosecution must adduce at least some probative evidence on each of the essential elements of the crime." *Frye v. United States,* 926 A.2d 1085, 1097 (D.C.2005) (internal quotation marks and citations omitted).

In interpreting a statute, we follow the general principle "that the intent of the lawmaker is to be found in the language that he has used." *Tippett v. Daly,* 10 A.3d 1123, 1127 (D.C.2010) (en banc) (quoting *Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 753 (D.C.1983) (en banc)). In that regard, "the words of the statute should be construed according to their ordinary sense and with the meaning commonly attributed to them." *Id.* (quotation marks and citation omitted). "The words of a statute are 'a primary index but not the sole index to legislative intent,'" *Grayson v. AT & T Corp.,* 15 A.3d 219, 238 n. 43 (D.C.2011) (en banc) (quoting *Citizens of Georgetown v. Zoning Comm'n of the District of Columbia,* 392 A.2d 1027, 1033 (D.C.1978) (other citations omitted)). "'[A] court may refuse to adhere strictly to the plain language of a statute in order to effectuate the legislative purpose as determined by a reading of the legislative history or by an examination of the statute as a whole.'" *District of Columbia v. Edison Place,* 892 A.2d 1108, 1111 (D.C.2006) (alteration in original) (quoting *Peoples Drug Stores, supra,* 470 A.2d at 754). "'[W]ords are inexact tools at best, and for that reason there is wisely no rule of law forbidding resort to explanatory legislative history....'" *Dis-*

*trict of Columbia v. Gallagher,* 734 A.2d 1087, 1091 (D.C.1999) (quoting *Harrison v. Northern Trust Co.,* 317 U.S. 476, 479, 63 S.Ct. 361, 87 L.Ed. 407 (1943)).

We now turn to the elements of the crime—attempted sale of drug paraphernalia—and the statutory framework of the DPA. "To prove an attempt, the government is not required to prove more than an overt act done with the intent to commit a crime ... which, except for some interference, would have resulted in the commission of the crime." *Evans v. United States,* 779 A.2d 891, 894 (D.C.2001) (quotation marks and citation omitted). "Every completed criminal offense necessarily includes an attempt to commit the offense, [and] ... a person charged with an attempt to commit a crime may be convicted even though the evidence shows a completed offense, not merely an attempt." *Id.* (quotation marks and citations omitted). Here, the overt act consisted of possessing, delivering and selling a glass ink pen together with a copper scouring pad, and the question is whether that act was done with the requisite intent to convict for a DPA offense.

In the context of this case, the pertinent part of the drug paraphernalia statute specifies:

It is unlawful for any person to deliver or sell, possess with intent to deliver or sell ... drug paraphernalia, knowingly, or under circumstances where one reasonably should know, that it will be used to ... inject, ingest, inhale, or otherwise introduce into the human body a controlled substance.

D.C.Code § 48–1103(b). The elements of a subsection (b) drug paraphernalia crime are:

(1) the possession of drug paraphernalia with specific intent to deliver or sell it,

(2) knowingly or where one reasonably should know,

(3) that it will be used to ingest or inhale a controlled substance.

To fully understand the first two elements, we look to the statutory definition of drug paraphernalia. D.C.Code § 48–1101(3) contains an extensive definition of "drug paraphernalia." [6] From the information filed against Ms. Fatumabahirtu and Mr. Aslam, it is apparent that the government relied on the definition of drug paraphernalia found in § 48–1101(3)(L)(i):

(L) Objects used, intended for use, or designed for use in ingesting, inhaling, or otherwise introducing Cannabis, cocaine, hashish, hashish oil, or any other controlled substance into the human body, including but not limited to:

6. D.C.Code § 48–1101(3) provides:
(3) "Drug paraphernalia" means:
(A) Kits or other objects used, intended for use, or designed for use in planting, propagating, cultivating, growing, or harvesting of any species of plant which is a controlled substance or from which a controlled substance can be derived;
(B) Kits or other objects used, intended for use, or designed for use in manufacturing, compounding, converting, producing, processing, or preparing a controlled substance;
(C) Isomerization devices or other objects used, intended for use, or designed for use in increasing the potency of any species of plant which is a controlled substance;
(D) Testing equipment or other objects used, intended for use, or designed for use in identifying or analyzing the strength, effectiveness, or purity of a controlled substance;
(E) Scales and balances or other objects used, intended for use, or designed for use in weighing or measuring a controlled substance;
(F) Diluents and adulterants, including, but not limited to: quinine, hydrochloride, mannitol, mannite, dextrose, and lactose, used, intended for use, or designed for use in cutting a controlled substance;
(G) Separation gins and sifters or other objects used, intended for use, or designed for use in removing twigs and seeds from, or in otherwise cleaning or refining, Cannabis or any other controlled substance;
(H) Blenders, bowls, containers, spoons, and other mixing devices used, intended for use, or designed for use in compounding a controlled substance;
(I) Capsules, balloons, envelopes, glassy plastic bags, or zip-lock bags that measure 1 inch by 1 inch or less, and other containers used, intended for use, or designed for use in packaging small quantities of a controlled substance;
(J) Containers and other objects used, intended for use, or designed for use in storing or concealing a controlled substance;
(K) Hypodermic syringes, needles, and other objects used, intended for use, or designed for use in parenterally injecting a controlled substance into the human body; and
(L) Objects used, intended for use, or designed for use in ingesting, inhaling, or otherwise introducing Cannabis, cocaine, hashish, hashish oil, or any other controlled substance into the human body, including, but not limited to:
(i) Metal, wooden, acrylic, glass, stone, plastic, or ceramic pipes with or without screens, permanent screens, hashish heads, or punctured metal bowls;
(ii) Water pipes;
(iii) Carburetion tubes and devices;
(iv) Smoking and carburetion masks;
(v) Roach clips;
(vi) Miniature spoons with level capacities of one-tenth cubic centimeter or less;
(vii) Chamber pipes;
(viii) Carburetor pipes;
(ix) Electric pipes;
(x) Air-driven pipes;
(xi) Bongs;
(xii) Ice pipes or chillers;
(xiii) Wired cigarette papers;
(xiv) Cocaine freebase kits; or
(xv) Cigarette rolling paper or cigar wrappers sold at a commercial retail or wholesale establishment, which does not derive at least 25% of its total annual revenue from the sale of tobacco products and which does not sell loose tobacco intended to be rolled into cigarettes and cigars.
The term "drug paraphernalia" shall not include any article that is 50 years of age or older.

(i) Metal, wooden, acrylic, glass, stone, plastic or ceramic pipes with or without screens, hashish heads, or punctured metal bowls....

The words "intended for use" raise the question as to whether the crime charged under § 48–1103(b) requires the government to prove specific intent. These words also invoke a question as to their relationship, if any, to the word "knowingly" or the words "under circumstances where one reasonably should know" in the second element of the crime. Section 48–1101 does not define "intended for use" or "knowingly." D.C.Code § 48–1102(a) identifies a non-exclusive list of factors that a court may consider in determining whether an item is drug paraphernalia.[7] Of the § 48–1102(a) factors three appear to be relevant—§ 48–1102(a)(4), (8), and (11). Under subsection (8) the packaging of a glass ink pen with a copper scouring pad suggests that the objects could be used to inject, ingest or inhale cocaine, but under subsection (11) courts must consider the scouring pad's legitimate use in the community—the cleaning of pots and pans. Under subsection (4), direct or circumstantial evidence may be used to prove a person's "intent ... to deliver [the object] to persons whom he or she knows, or should reasonably know, intend[ ] to use the object to facilitate a violation of § 48–1103(a)." Thus, when read in conjunction with § 48–1102(b), § 48–1102(a)(4) raises the possibility that the court could infer that the owner and sales clerk at the Georgia Avenue commercial retail store intended to sell the ink pen and the scouring pad for use as a pipe with which to ingest or inhale cocaine. Nevertheless, because there is some vagueness and ambiguity in subsection (a)(4), and the DPA, relating to the concepts of intent and knowledge, we believe that explanatory legislative history may assist the court to "effectuate the

7. D.C.Code § 48–1102 provides:

(a) In determining whether an object is drug paraphernalia, a court or other authority shall consider, in addition to all other logically and legally relevant factors, the following factors:

(1) Statements by an owner or by anyone in control of the object concerning its use;

(2) The proximity of the object, in time and space, to a violation of § 48–1103(a) or to a controlled substance;

(3) The existence of any residue of a controlled substance on the object;

(4) Direct or circumstantial evidence of the intent of an owner, or of anyone in control of the object, to deliver it to persons whom he or she knows, or should reasonably know, intends to use the object to facilitate a violation of § 48–1103(a); the innocence of an owner, or of anyone in control of the object, as to a violation of § 48–1103(a) shall not prevent a finding that the object is intended for use, or designed for use as drug paraphernalia;

(5) Instructions, oral or written, provided with the object concerning its use;

(6) Descriptive materials accompanying the object which explain or depict its use;

(7) National and local advertising concerning the use of the object;

(8) The size or packaging of the object, or the manner in which it is displayed;

(9) Whether the owner, or anyone in control of the object, is a legitimate supplier of like or related items to the community, including, but not limited to, a licensed distributor or dealer of tobacco products;

(10) Direct or circumstantial evidence of the ratio of sales of the object or objects to the total sales of the business enterprise;

(11) The existence and scope of legitimate uses for the object in the community; and

(12) Expert testimony concerning its use.

(b) Where the alleged violation of the act occurred at a commercial retail or wholesale establishment, the court or other authority may infer, based upon consideration of the factors in subsection (a) of this section, that the following items are drug paraphernalia:

(1) Glassy plastic bags or zip-lock bags that measure 1 inch by 1 inch or less; or

(2) Metal, wooden, acrylic, glass, stone, plastic, or ceramic pipes, with or without screens, permanent screens, hashish heads, or punctuated metal bowls.

purpose" of the DPA, *Edison Place, supra,* 892 A.2d at 1111, and case law from other jurisdictions may prove helpful.

Legislative history of the District's DPA reveals that our statute is based on the Model Drug Paraphernalia Act drafted by the federal Drug Enforcement Administration ("DEA") in 1979 ("MDPA"). COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON THE JUDICIARY, Report on Bill 4-5 (Apr. 28, 1982) ("Committee Report"). The DEA drafted the MDPA in response to questions concerning the constitutionality of then-existing drug paraphernalia statutes due to the perceived vagueness of some of the language contained in those statutes. Prior to the drafting of the MPDA, several state drug paraphernalia statutes were invalidated as unconstitutionally vague because they did not provide proper notice as to when otherwise innocuous household items qualified as drug paraphernalia. *See State v. Lee,* 75 Haw. 80, 856 P.2d 1246, 1256 (1993) (citing *The Model Drug Paraphernalia Act: Can We Outlaw Head Shops—And Should We?,* 16 Ga. L.Rev. 137, 144–48 (1981)). The issue was one of intent. The problem was that when a person sold an otherwise innocuous item that could be used to inject, ingest, or inhale drugs, to find the seller guilty, trial courts would have to transfer the intent of the drug user (the buyer) to the seller, and they were reluctant to do so. *See State v. Smoke Signals Pipe & Tobacco Shop, LLC,* 155 N.H. 234, 922 A.2d 634, 639 (2007) (rejecting defendant's argument that the statutory term "customarily intended for [use with drugs]" allowed the drug user's intent to be transferred to the seller of otherwise innocuous items because specific intent was a required ele-

ment of the statute). This interpretation left sellers without proper notice as to when sale of a commonly used product or an innocuous household item would be illegal.[8] So, without a specific intent requirement directed at the seller, a drug paraphernalia statute would place a burden and an affirmative duty on a seller of innocuous household items to investigate whether a buyer would use it to inject, ingest or inhale illegal drugs. Otherwise, the seller would face criminal liability even though he or she never intended to aid the buyer in that illegal purpose, and the statute never put him on notice of that sale of a particular innocuous household item could result in prosecution and conviction of a crime. *See Tobacco Accessories and Novelty Craftsmen Merchs. Ass'n of Louisiana v. Treen,* 681 F.2d 378, 383 (5th Cir. 1982) ("To prosecute a person for the sale of an item, both intended and understood to be used lawfully, would run afoul of the due process clause.").

The DEA included a specific intent requirement in the MDPA to avoid the invalidation of a drug paraphernalia statute on the ground of constitutional vagueness. As it explained, in part, in a comment:

> To insure that innocently possessed objects are not classified as drug paraphernalia, Article I [the definitions section] makes the knowledge or criminal intent of the person in control of an object a key element of the definition.... [W]hen an object is controlled by people who use it illegally, or who intend to use it illegally, or who design or adapt it for illegal use, the object can be subject to control and the people subjected to prosecution. Article I re-

---

8. For example, Sudafed, a common cold remedy, contained an ingredient, pseudophedrine, which could be used to make the drug, methamphetamine (also known as crystal meth, speed, crank, and ice). Prior to the MDPA, and prior to steps taken by drugstores and by the manufacturer of Sudafed, pharmacists conceivably could have been prosecuted for selling a product that could be used to make an addictive drug.

quires, therefore, that an object be used, or designed for use in connection with illicit drugs before it can be controlled as drug paraphernalia.

Hinging the definition of drug paraphernalia on a specific intent to violate, or to facilitate a violation of, the drug laws also provides "fair warning" to persons in possession of property potentially subject to this Act. A statute is not unconstitutionally vague if it embodies a specific intent to violate the law.

MODEL DRUG PARAPHERNALIA ACT Art. 1 cmt. at 6–7. (Drug Enforcement Admin.1979). In addition, the DEA's comments on the Section B offense of Article II, which appears in our statute as D.C.Code § 48–1102(b), expound on the knowledge element:

The knowledge requirement of Section B is satisfied when a supplier: (i) has actual knowledge an object will be used as drug paraphernalia; (ii) is aware of a high probability an object will be used as drug paraphernalia; or (iii) is aware of facts and circumstances from which he should reasonably conclude there is a high probability an object will be used as drug paraphernalia. Section B requires a supplier of potential paraphernalia to exercise a reasonable amount of care. He need not undertake an investigation into the intentions of every buyer, but he is not free to ignore the circumstances of a transaction. Suppliers of objects capable of use as paraphernalia may not deliver them indiscriminately. Since each element of Section B must be proven beyond a reasonable doubt, legitimate, prudent suppliers will not be affected by this section.

*Id.* Art. 2 cmt. at 11. The Committee Report noted that Maryland's drug paraphernalia act also was patterned on the MDPA, and that the Maryland Court of Appeals had determined that the Mary-

land statute was unconstitutionally vague. Committee Report, Attachment B; *see also Mid–Atlantic Accessories Trade Ass'n v. Maryland,* 500 F.Supp. 834 (D.Md.1980).

*Mid–Atlantic Accessories Trade Ass'n* involved a constitutional challenge to the enactment and codification of the MDPA into Maryland law. The challenge was brought by a trade association and retail distributors who manufactured, distributed, or sold products that could be considered drug paraphernalia under the Maryland law. *Id.,* 500 F.Supp. at 836–37. In construing statutory provisions that are identical to the District's DPA (with the exception of a few minor word changes), the federal court "conclude[d] that the Maryland statute is not vague inasmuch as it prohibits only acts done with specific intent." *Id.* at 844. The court explained the relationship between the intent and knowledge concepts in determining that the Maryland statute was not unconstitutional:

[The Maryland statute] incorporates a specific intent standard in two ways. First, drug paraphernalia is defined ... as any item "used, intended for use, or designed for use" with illegal drugs. Secondly, the substantive offenses are defined in terms of specific intent. The prohibited acts are (1) using drug paraphernalia, or possessing same with intent to use, to, inter alia, inject, ingest, inhale or otherwise introduce illegal drugs into the human body ... and (2) selling or manufacturing drug paraphernalia knowing, or under circumstances where one reasonably should know, that the drug paraphernalia will be used, to, inter alia, inject, ingest, inhale or otherwise introduce illegal drugs into the human body.... In the absence of the first sort of specific intent, nothing is drug paraphernalia. In the absence of the second, no act committed by a person

and involving drug paraphernalia is prohibited.

*Id.* at 844.

 Other jurisdictions that have incorporated the MDPA into their respective statutes have held that the drug paraphernalia law requires the government to prove both specific intent and knowledge as elements of the drug paraphernalia offense. Although some jurisdictions require proof of a seller's specific intent that a buyer use the items for ingesting controlled substances, *see, e.g., The Casbah, Inc. v. Thone,* 651 F.2d 551, 561 n. 12 (8th Cir. 1981) (" 'In the context of an alleged sale or delivery of drug paraphernalia, [the Nebraska drug paraphernalia law, which is based on the MPDA,] requires the state to prove both (1) that the defendant intended that an item would be used for the production or consumption of controlled substances and also (2) that he either knew, or that he acted in a set of circumstances from which a reasonable person would know, that the buyer of the item would thereafter use it for those purposes' " (quoting *Delaware Accessories Trade Ass'n v. Gebelein,* 497 F.Supp. 289, 294 (D.Del.1980))). *Lee, supra,* 856 P.2d at 1261 ("the jury should be instructed that it must first find that the defendant-seller delivered the object(s) in question to the buyer with the specific intent that the object(s) be used with illegal drugs"; "without the defendant's intent, none of the[ ] [statutory] examples or factors, in and of themselves, can transform an object into drug paraphernalia"); *Maine v. Huntley,* 473 A.2d 859, 863 (Me.1984) (charging document was required to allege all of the essential elements of the crime—sale of a soapstone pipe "with the intent that it be used in connection with scheduled drugs and that [defendant] knew or reasonably should have known that the pipe would be used with illegal drugs,") we agree with the Supreme Judicial Court of Massachusetts that "[t]he words 'intended for use' refer to a defendant's or seller's intention as to the use of the item he possesses for sale, not to the purchaser's intended use." *Commonwealth v. Jasmin,* 396 Mass. 653, 487 N.E.2d 1383, 1386 (1986) (statute "is a specific intent crime (the knowing possession of drug paraphernalia with intent to sell it), with an additional ... element concerning the defendant's knowledge of the use to which the item would be put or reasonably would be expected to be put"). *Jasmin* correctly puts the focus on the seller's specific intent to sell drug paraphernalia and avoids an erroneous interpretation that centers on the seller's specific intent that the buyer use the items sold in a certain way.

In addition, in drafting the MDPA, the DEA commented that the intent element of the statute could be proved through circumstantial evidence:

> To insure that innocently possessed objects are not classified as drug paraphernalia, Article I makes the knowledge of criminal intent of the person in control of an object a key element of the definition.
>
> . . . .
>
> An object is considered to be drug paraphernalia whenever the person in control intends it for use with illicit drugs.... It can be proved directly such as by admissions of the person in control, or indirectly through circumstantial evidence.

MODEL DRUG PARAPHERNALIA ACT, Art. 1 cmt., *supra,* at 6, 7.

 Based upon our examination of the language used in the District's DPA, the legislative history of the DPA, and state and federal case law construing drug paraphernalia laws that are virtually identical to the DPA, we hold that in a case like the one before us, the government

must establish as elements of the D.C.Code § 48–1103(b) offense that (1) the owner or clerk of a retail store had the specific intent to deliver or sell drug paraphernalia, in this case a glass ink pen, together with a scouring pad, and (2) the owner or clerk knew, or reasonably should have known, that the buyer of the items would use the items illegally to inject, ingest, or inhale a controlled substance. We further hold that in our jurisdiction both the specific intent and knowledge requirements of D.C.Code § 48–1103(b) are satisfied by credible and compelling direct, indirect, or circumstantial evidence that, at the time of the sale, the owner or clerk of a retail establishment had knowledge or reasonably should have known that the buyer would use the items sold together (here a glass ink pen and a copper scouring pad) to inject, ingest, or inhale a controlled substance. In addition, we hold that as construed in this opinion, the DPA is not unconstitutionally vague.

Finally, we conclude that in light of the testimony of Officers Garcia, Kyle, Janczyk, and Detective Dessin, and the trial court's credibility determinations, the government presented credible, strong and compelling indirect and circumstantial evidence beyond a reasonable doubt that at the time Ms. Fatumabahirtu sold the glass ink pen and the copper scouring pad to Officer Garcia, she and Mr. Aslam knew or reasonably should have known that the buyer would use these items to inject, ingest, or inhale a controlled substance, and thus, the trial court properly convicted them of attempted sale of drug paraphernalia. The trial court credited Officer Garcia's account of the sale, that he asked for "an ink pen" and that Ms. Fatumabahirtu gave him a glass ink pen and a metal scouring pad, even though he did not request a metal scouring pad. The trial court could reasonably infer that despite the fact that Ms. Fatumabahirtu had recently arrived in the United States, someone at the store trained her to give a buyer both a glass ink pen and a copper scouring pad when the buyer asked for an ink pen, and that she either knew or reasonably should have known that the purchase was for the purpose of taking illegal drugs. Moreover, the trial court could reasonably infer from the testimony of Officers Kyle and Janczyk and Detective Dessin, that as the owner of the store, Mr. Aslam ordered, stored, and specifically intended to sell items that obviously could be used with illegal drugs—digital scales, empty ziplock bags, glass ink pens (located "behind the counter") that had little ink, and copper scouring pads. Under these circumstances, we see no need to remand this case solely for the purpose of having the trial court state that the government's evidence satisfied the knowledge and specific intent requirements of our drug paraphernalia statute.[9]

Accordingly, for the foregoing reasons we affirm the judgment of the trial court.

*So ordered.*

9. We are not persuaded by Mr. Aslam's argument that the rule of lenity requires the DPA to be construed in his favor. *See Mack v. United States,* 6 A.3d 1224, 1233 (D.C.2010). Nor do we agree with Ms. Fatumabahirtu's contention that her conviction should be reversed because of an alleged fatal variance between the original charge and the evidence presented at trial. *See United States v. Nance,* 481 F.3d 882, 886 (6th Cir.2007).