DISTRICT OF COLUMBIA, Appellant,

v.

Edison PLACE, Appellee.

No. 04–TX–968.

District of Columbia Court of Appeals.

Argued Nov. 16, 2005.

Decided Feb. 9, 2006.

---

James C. McKay, Jr., Senior Assistant Attorney General, with whom Robert J. Spagnoletti, Attorney General for the District of Columbia, and Edward E. Schwab, Deputy Attorney General, were on the brief, for appellant.

David A. Fuss was on the brief for appellee.

Before WASHINGTON, Chief Judge, and SCHWELB and FISHER, Associate Judges.

WASHINGTON, Chief Judge:

The District of Columbia ("government") appeals the decision of the Superior Court lowering the supplemental assessment of commercial real property owned by appellee Edison Place, LLC ("Edison Place") by $11,193,000. The trial court held that as a matter of law, the District of Columbia could not include an increase in land value in a supplemental assessment because such changes to land valuation can only occur via a scheduled general assessment. The reduction of $11,193,000 represents

the portion of the increase identified in the assessment as the increased value of the land. We agree with the trial court's interpretation of the supplemental assessment law—D.C.Code § 47–829 (2001)—and affirm the grant of summary judgment in favor of the appellee Edison Place.

## I.

Edison Place is the owner of commercial real property located at 701 9th Street, N.W. For real estate tax purposes, this property is identified as Lot 24, Square 405 (the "Property"). The Property had previously been assessed for the full 2001 tax year at $17,608,500. The date of valuation was January 1, 2000. At that time, construction was being performed on the Property but was not substantially complete, thus the original assessment reflected the value of the land only.

Triggered by the substantial completion of the new construction, Edison Place received notice dated February 28, 2001, from the D.C. Office of Tax and Revenue ("OTR") of a second-half Tax Year 2001, supplemental tax assessment on the Property. The supplemental assessment accounted for a total of $46,779,500 worth of increased value for land and improvements. The OTR increased the value of the property in two respects: (1) it increased the value of the land by $11,193,000, from $17,608,500 to $28,801,500, and (2) it increased the property's improvement value from $0 to $35,586,500.

Edison Place filed an appeal with the Board of Real Property Assessments and Appeals ("BRPAA") on or about August 1, 2001. The BRPAA conducted a hearing on December 14, 2001, and issued a decision dated December 27, 2001, sustaining the OTR assessment. Claiming that as a matter of law a supplemental assessment can only be applied to increases in the property's improvement value, not an increase in land value, Edison Place appealed the administrative decision to the Superior Court Tax Division.

As an initial matter, the government filed a motion in limine that it characterized as a request for the trial court to confirm "the District's statutory authority to base a supplemental assessment of real property on the market value of both the land and the improvements." The trial court granted the government's motion in limine. Despite this ruling, Edison Place subsequently filed a motion for summary judgment on the grounds that the government did not have the statutory authority to base the supplemental assessment of real property on increased value of the land. Contrary to its ruling on the government's motion in limine, the trial court agreed with Edison Place and granted the motion for summary judgment. Citing various portions of the legislative history, *inter alia*, the trial court interpreted the law as allowing a supplemental assessment only on new structures, and not on the land itself. The government sought reconsideration of the trial court's grant of summary judgment. After reconsideration was denied, the government timely filed a notice of appeal to this court.

## II.

 This appeal comes to us from a grant of summary judgment. There are no issues of material fact in dispute; thus the only real issue before this court is one of statutory interpretation. Specifically, the government challenges the trial court's legal ruling that D.C.Code § 47–829 (2001) prevents the OTR from including changes in the value of previously assessed land as part of a supplemental assessment. This court reviews both trial court decisions granting summary judgment and questions of statutory interpre-

tation *de novo. See, e.g., District of Columbia v. Cato Inst.,* 829 A.2d 237, 239 (D.C.2003) (stating that issues of statutory interpretation are reviewed *de novo*); *Joeckel v. DAV,* 793 A.2d 1279, 1281 (D.C. 2002) ("We review the grant of a motion for summary judgment *de novo* .... [O]ur standard of review is the same as the trial court's standard in considering the motion for summary judgment .... A motion for summary judgment should be granted whenever the court concludes that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (Citations omitted)).

▇▇▇▇ The rules of statutory construction are well established in this jurisdiction. "Our first step when interpreting a statute is to look at the language of the statute." *Jeffrey v. United States,* 878 A.2d 1189, 1193 (D.C.2005). "The primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used." *Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 753 (D.C.1983) (en banc) (citing *Varela v. Hi–Lo Powered Stirrups, Inc.,* 424 A.2d 61, 64 (D.C.1980) (en banc)). "It is axiomatic that 'the words of the statute should be construed according to their ordinary sense and with the meaning commonly attributed to them.'" *Id.* (quoting *Davis v. United States,* 397 A.2d 951, 956 (D.C.1979)). When interpreting the language of a statute, we must look to the plain meaning if the words are clear and unambiguous. *District of Columbia v. District of Columbia Office of Employment Appeals,* 883 A.2d 124, 127 (D.C.2005) (citing *Jeffrey, supra,* 878 A.2d at 1193). Usually "[w]hen the plain meaning of the statutory language is unambiguous, the intent of the legislature is clear, and judicial inquiry need go no further." *District of Columbia*

*v. Gallagher,* 734 A.2d 1087, 1091 (D.C. 1999) (citations omitted).

▇▇▇▇ The courts, however, must not "make a fetish out of plain meaning" nor should they "'make a fortress out of the dictionary.'" *J. Parreco & Son v. District of Columbia Rental Hous. Comm'n,* 567 A.2d 43, 46 (D.C.1989) (quoting *Cabell v. Markham,* 148 F.2d 737, 739 (2d. Cir.) (Learned Hand, J.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945)). "[A] court may refuse to adhere strictly to the plain language of a statute in order 'to effectuate the legislative purpose' as determined by a reading of the legislative history or by an examination of the statute as a whole." *Peoples Drug Stores, supra,* 470 A.2d at 754 (citations omitted). "[E]ven where the words of a statute have a 'superficial clarity,' a review of the legislative history or an in-depth consideration of alternative constructions that could be ascribed to statutory language may reveal ambiguities that the court must resolve." *Id.; see also Gallagher, supra,* 734 A.2d at 1091 ("[W]ords are inexact tools at best, and for that reason there is wisely no rule of law forbidding resort to explanatory legislative history ...." (quoting *Harrison v. Northern Trust Co.,* 317 U.S. 476, 63 S.Ct. 361, 87 L.Ed. 407 (1943))); *Jeffrey, supra,* 878 A.2d at 1193 ("The literal words of [a] statute ... are not the sole index to legislative intent, but rather, are to be read in the light of the statute taken as a whole, and are to be given a sensible construction and one that would not work an obvious injustice." (quoting *Columbia Plaza Tenants' Ass'n v. Columbia Plaza L.P.,* 869 A.2d 329, 332 (D.C.2005))). "Statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." *Parreco, supra,* 567 A.2d at 46 (quoting *Cabell, supra,* 148 F.2d at 739).

For tax purposes, "[t]he assessed value for all real property [in the District] shall be the estimated market value of such property as of January 1st of the year preceding the tax year, as determined by the Mayor." D.C.Code § 47–820(a)(3) (2001). "Real property" is a term of art defined by D.C.Code § 47–802(1) (2001) to mean "real estate identified by plat on the records of the District of Columbia Surveyor according to lot and square together with improvements thereon."

Under special circumstances, the District may perform supplemental assessments twice a year. See D.C.Code § 47–829 (2001).[1] One of the triggering events that allows the District to conduct a supplemental assessment "of all real property, by lot and square," is if "[t]here is construction in progress and at least 65% of the total estimated construction has occurred." D.C.Code § 47–829(d)(1)(C). D.C.Code § 47–821(a)(1) (2001) provides that "[t]he Mayor shall assess all real property, identifying separately the value of land and improvements therein."

■■■■ The government's position is that the plain language of the statute clearly shows that a supplemental assessment may be performed on all real property, which is defined as land and the improvements thereon. The statute, having clear and unambiguous language, thus obviates the need to probe through legislative history to divine the law's purpose.

Edison Place argues that the legislative history clearly evidences the Council's intent not to include land revaluation as part of any supplemental assessment of real property. Edison Place also raises an additional argument not made in the trial court: that by regulation, all property in the District of Columbia shall be assessed on the date of valuation, and a supplemental assessment does not alter the date of assessment with respect to the value of the land.[2] See 9 DCMR § 306.1 (1998).

---

1. D.C.Code § 47–829(a) states that:

 In addition to the annual assessment of real property made pursuant to § 47–820(b), the Mayor, pursuant to subsections (b) through (f) of this section, shall conduct a supplemental assessment of real property between January 1 and June 30, to become effective October 1, and payable March 31, and again between July 1 and December 31, to become effective April 1, and payable September 15, of each calendar year.

2. Typically, claims not advanced in the trial court may not be heard on appeal. See D.D. v. M.T., 550 A.2d 37, 48 (D.C.1988). We are not, however, "unduly unbending to the foregoing standard." Id. On occasion, this court may exercise its discretion to entertain a new claim if it is purely a question of law and the factual record is complete to address the new matter. As the Supreme Court has held, "even if a claim was not pressed below, it properly may be addressed on appeal so long as it was passed upon." District of Columbia v. Helen Dwight Reid Educ. Found., 766 A.2d 28, 33 (D.C.2001) (citing United States v. Williams, 504 U.S. 36, 40–41, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992)).

We have long recognized, too, that in "exceptional situations and when necessary to prevent a clear miscarriage of justice apparent from the record," we may deviate from the usual rule that our review is limited to issues that were properly preserved. In general, an appellate court has discretion, in the interests of justice, to consider [a claim] that is raised for the first time on appeal if the issue is purely one of law, particularly if the factual record is complete and a remand for further factual development would serve no purpose, the issue has been fully briefed, and no party will be unfairly prejudiced. Id. (citations omitted).

Not only was the present case briefed by both parties, the government joins Edison Place in requesting this court to address the issue at hand. Given that the factual record is complete and recognizing the injustice in having parties re-raise, re-litigate, and then re-appeal this issue were we to remand, we will consider Edison Place's newly introduced claim.

■ When interpreting a statute, this court reads provisions of the law "in the light of the statute ... as a whole" so as to avoid construction that would result in an "obvious injustice." *Jeffrey, supra,* 878 A.2d at 1193. Based on a macroscopic view of the entire statutory and regulatory framework of commercial real property taxation, we cannot say that the provision authorizing supplemental assessments is clear and unambiguous. Specifically, 9 DCMR § 306.1 creates an ambiguity in D.C.Code § 47–829, which requires clarification. Thus, we must look to the legislative history of the statute so that we may interpret the relevant provision in a way that is "more faithful to the purpose than [to] the word." *Jeffrey, supra,* 878 A.2d at 1193 (citations omitted).

Authorization for supplemental assessments of commercial real estate in the District dates as far back as 1937. *See* Amendments to District of Columbia Revenue Act of 1937, ch. 223, Title IX, § 5(b), 52 Stat. 356, 373 (1938). Congress authorized a supplemental assessment to be performed on any real estate that was not previously assessed and for new structures added to existing property. *See id.* Such additions to existing property included all new structures erected or roofed, additions to or improvements of old structures which have not been assessed, and new buildings erected or under roof. *See id.*

Astute owners of commercial real estate soon noticed a loophole in the 1937 Revenue Act in the term "structures erected or roofed." Taxpayers could, based on the language of the statute, avoid their tax obligations by choosing not to "roof" their new building. Simply put, an owner of commercial real estate could avoid taxation simply by not completing construction on the top floor of his/her new office building. This loophole in the District's tax law led to changes in the statute and a fine-tuning

of which structures were subject to taxation. Specifically, the concern of the D.C. Council was captured in the Report of the Committee on Finance and Revenue when the Council was considering amendments to the then current legislation:

> Technological advances in the construction industry coupled with the Department of Finance and Revenue's interpretation of "erected and roofed" has resulted in a loophole in [the supplemental assessment] law allowing for abuse. Today, new construction projects may receive certificates of occupancy and open for business on all but the top floors and escape appropriate assessments and taxation because the roof to the structure has not been completed. As a result, the District is deprived of much needed revenues, and new construction (whether it is a new building or of an addition to or improvement of an old building) fails to carry its fair share of the real property tax burden and may enjoy a competitive advantage over already existing structures.

*Council of the District of Columbia Rpt.,* Memorandum To: All Council Members from John A. Wilson, Chairperson, Comm. ON FIN. & REV., RPT OF THE COMM. ON FIN. & REV. ON BILL 8–170, the *Real Property Improvements and New Construction Tax Amendment of 1990* at 3 (Oct. 18, 1990) (hereinafter "Committee Report").

Chairperson Wilson further explained the District's need to amend its supplemental assessment laws:

> Under current law new structures are assessed and taxed only after they are erected or roofed and additions to or improvements of old structures and construction in progress are assessed and taxed only after the improvement is erected and roofed. The amendment deletes the erected and/or roofed re-

quirement, allowing for the assessment and taxation of: (1) all new structures; (2) additions to or improvements of old structures; (3) construction in progress in which 65% of the total estimated construction has occurred; or (4) a conversion and the change in estimated market value of the real property is at least $100 thousand.

*Id.* at 6.

Reading the legislative history of § 47–829 one cannot help but take notice of the Council's singular focus and concern with structures: either the construction of new structures, or improvements to existing structures. The elimination of the "loophole" was aimed at allowing the District to receive tax revenue from the completion of the structure itself, because without the structure there is no new real estate to assess. There is no discussion in the legislative history to suggest that the Council intended to allow the supplemental assessment of any increase in land value due to the addition of structures to the property. In fact, there is no mention at all in the legislative history of any concern with the assessment of the land itself. It is the construction, addition, and improvements of buildings and edifices that the Council was solely concerned with, not variations in market value of the land. This focus on structures is further evidenced by the Committee Report's explanation on how real property should be assessed under a supplemental assessment:

The change in estimated market value does not necessarily refer to the cost of the improvement, addition or construction materials, but rather to the *value to the entire improvement which the new construction · or improvement adds.* While cost and value may be the same, they are not always synonymous, therefore *it is the intent of this provision to assess the entire structure anew,* factor-

ing in the contributory value of any addition to or improvement of old structures and not necessarily the value or cost of the addition or the improvement itself. Thus, while the actual cost of an improvement may be $75 thousand, the estimated market value as a result of the improvement may be $150 thousand, in which case the real property is subject to the supplemental assessment.

Committee Report at 8 (emphasis added). The Council's intent to allow supplemental assessment for improvements alone, and not land and improvements, is also supported by the legislative history describing the appeals procedures available to commercial taxpayers subject to a supplemental assessment:

The legislation also provides for the Mayor to assess all real property erroneously omitted and all ' real property which was not listed on the previous assessment roll or tax list and all improvements upon which damage or destruction has occurred. This provision is merely a clarification of the current statute. Finally, Bill 8–170 retains the current provisions providing for the · right to appeal and review of the assessment by the Board of Equalization and Review, and the right to appeal the assessment by the Superior Court of the District of Columbia. *These appeals are limited to the value of the structure or construction in progress, and not the value of the land, which is only revalued during the annual general assessment.*

*Id.* at 9 (emphasis added).

It is clear from the legislative history of § 47–829 that the sole focus of the Council was on eliminating what was then a loophole in the supplemental assessment statute. Patching this loophole served only one purpose: allowing the District to receive revenue through supplemental assessments based on the increased value of

structures situated on commercial land, and not on the increased market value of the land itself. Nothing in the legislative history evidences an intent of the Council to change longstanding conceptions of property assessments. Prior to the 1991 change in tax law, it was the established law in the District that once real property has "been finally assessed, it cannot be again [re]assessed." *See Hunt v. District of Columbia,* 71 App. D.C. 143, 145, 108 F.2d 10, 12 (1939) (citations omitted). In other words, "[i]f the assessors have once assessed ... that assessment cannot be revised by supplemental assessment." *1111 19th Street Assoc. v. District of Columbia,* 521 A.2d 260, 266 (D.C.1987) (citing *Hunt, supra,* 71 App. D.C. at 146, 108 F.2d at 12) (alteration in original), *cert. denied,* 484 U.S. 927, 108 S.Ct. 291, 98 L.Ed.2d 251 (1987).

The case law is reinforced by Section 306.1 of Title 9 of the D.C. Municipal Regulations, which provides that:

> The assessed value of all real property shall be the proposed estimated market value established on or before January 1st of the year preceding the tax year, as determined by the Deputy Chief Financial Officer, except as follows:
>
> > (a) The assessed value of new structures and other improvements added to the assessment roll as of July 1st each year shall be the estimated market value as of that July 1st; and
> > (b) The assessed value of new structures and improvements added to the assessment roll as of January 1st each year shall be the estimated market value as of January 1st of the tax year.

9 DCMR § 306.1. This regulation, which was codified prior to the 1990 tax amendments but was not omitted from the DCMR, remains consistent with the current law. All real property, land and improvements, is to be assessed on January 1st of the preceding tax year via the general assessment. There are two exceptions, subsections (a) and (b), that allow for a change in the date of assessed value for structures and improvements alone, via a supplemental assessment. Neither of the exceptions speaks of "real property"both land *and* improvements. Instead, the exceptions to when real property is to be valued are limited to improvements.

Although the case law and the municipal regulations cited both predate the amendment to the tax law, nothing in the legislative history of § 47–829 indicates an intent to alter or overturn these aspects of the District's tax law. With respect to amending § 47–829, the Council was interested only in patching up its problematic loophole of "unroofed" structures.

■ In sum, the legislative history does not support the government's reading of D.C.Code § 47–829. Supplemental assessments are limited only to improvements on the land, and not changes in the value of the land itself. A reassessment of the entire real property—the improvements *and* the land—may only be performed during the scheduled general assessment.

For the foregoing reasons, the decision of the trial court is

*Affirmed.*