*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

## No. 22-CV-0200

THEODORE ALBERT NELBACH, APPELLANT,

V.

WILLOW NELBACH, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2021-CA-002048-R(RP))

(Hon. Robert R. Rigsby, Superior Court Judge)

(Argued January 19, 2023                                    Decided April 6, 2023)

*Anna L. Nathanson* for appellant.

*David E. Bateman*, with whom *Daniel M. Rathbun* was on the brief, for appellee.

Before BECKWITH, EASTERLY, and MCLEESE, *Associate Judges*.

EASTERLY, *Associate Judge*: The concept of "waste" with respect to real property in American law is many centuries old and traces back to statutes enacted in the 13th century by the nascent English Parliament. Our focus in this case is on one of these statutes, the Statute of Gloucester. As translated in the mid-1700s from

its original Norman French, the Statute in relevant part defines the "Several Tenants against whom an Action of Waste is maintainable." 6 Edw. 1 c. 5 (1278). Approximately 600 years later, the Statute of Gloucester became part of D.C. law. Its archaic language is still largely preserved in D.C. Code § 42-1601, which provides in full:

> A man from henceforth shall have a writ of waste in the chancery against him that holdeth by law, or otherwise for term of life, or for term of years; and he which shall be attainted of waste, shall lease the thing that he hath wasted, and moreover shall recompense thrice so much as the waste shall be taxed at.

In contemporary English, we understand this statute to say that a party holding a future interest in real property may sue the tenant for life or years for "waste" that the property suffers, and if successful in such a suit, the party is entitled to both the tenant's interest in the property *and* treble damages.

With this dual remedy, the statute packs quite a punch. But when is it properly invoked? More specifically, what constitutes waste? Neither the Statute of Gloucester nor the D.C. Code defines this term, and this court has never supplied a definition. This case requires us to consider the meaning of "waste" in D.C. Code § 42-1601 and in particular to determine whether a property tax arrearage that triggers a notice of delinquency and possible foreclosure by the District of Columbia can, as a matter of law, support a judgment of waste. We hold that it cannot. Based

on the history of the District's waste statute and the evolution of like statutes in other jurisdictions, we conclude that the harsh consequences to a life tenant who commits "waste" are rooted in the gravity and irreversibility of the injury suffered by the holder of the remainder interest. But under the District's current property tax scheme, an arrearage does not automatically or inevitably lead to dire consequences; even after the District has initiated proceedings for a tax sale, the pre-existing owner or owners retain the right of redemption up until a judgment foreclosing that right becomes final. To hold that a tax arrearage alone constitutes waste would skew the incentives of the person with a remainder interest in the property in a way that we conclude is antithetical to the waste doctrine.

Accordingly, we vacate the Superior Court's order concluding that appellant Theodore Nelbach wasted his life tenancy in the property at 4517 Clay Street NE within the meaning of D.C. Code § 42-1601 by allowing a tax arrearage to accrue and granting summary judgment to remainderperson and appellee Willow Nelbach on her action against Mr. Nelbach for forfeiture of the property and treble damages.

## I.     Facts and Procedural History

Following the death of the owner of 4517 Clay Street NE, Mr. Nelbach and

Ms. Nelbach each received an interest in this residential property in 2015. Mr. Nelbach became a life tenant, while Ms. Nelbach was given the remainder interest. Mr. Nelbach took possession of the property to use as a rental unit. In the second half of 2017, the property began to accrue a balance of unpaid real estate taxes. Although Mr. Nelbach appears to have made partial payments on the tax balance in 2019 and 2021, by early 2021 the accumulated arrearage, interest, and fees amounted to nearly $7,000.

In April 2021, the District issued a Notice of Delinquency regarding unpaid taxes on the property. The notice identified Mr. Nelbach as the "owner" and near the top of the page warned, "FAILURE TO PAY TAXES IMMEDIATELY MAY HAVE SERIOUS CONSEQUENCES, WHICH MAY INCLUDE LOSS OF TITLE TO THE PROPERTY." After identifying the property by lot number and address, it stated, "TO AVOID TAX SALE YOU MUST PAY $6,955.78 by May 31, 2021." Immediately below this language, however, the notice indicated that payment could be made, albeit for a greater amount, after May 31, 2021, and still prevent the tax sale. The notice also explained that no real property would be sold at a tax sale for less than $2,500. After unsuccessfully demanding that Mr. Nelbach pay the taxes owed, Ms. Nelbach submitted a payment of $5,600 to the District on May 29, 2021, reducing the arrearage to $2,126.26.

A few weeks later, in June 2021, Ms. Nelbach filed a complaint in Superior Court for waste under D.C. Code § 42-1601,[1] asserting that Mr. Nelbach's "failure to pay the taxes and liabilities associated with the Property constitute[d] waste of the same"[2] and requesting treble damages and termination of Mr. Nelbach's life tenancy. Answering the complaint pro se, Mr. Nelbach conceded that Ms. Nelbach had paid $5,600 in outstanding taxes and said he would be "happy" to reimburse Ms. Nelbach for "her contributions to the tax." But he disputed that his failure to pay taxes constituted waste and "disagree[d] that [he] ha[d] forfeited [his] interest in the property."

Ms. Nelbach moved for summary judgment in August 2021, arguing that there were no material disputes of fact in light of Mr. Nelbach's admission "that he has not paid the real estate taxes" and that she should prevail as a matter of law on her

---

[1] Ms. Nelbach's complaint is styled in two counts, but both sound in waste— one explicitly invoking D.C. Code § 42-1601 and the other requesting a declaratory judgment that Mr. Nelbach had committed waste and that Ms. Nelbach was entitled to the termination of his interest.

[2] Ms. Nelbach's complaint also conclusorily asserted that Mr. Nelbach "allowed the Property to devolve into disrepair," supporting a determination of waste. She did not reiterate this assertion in her motion for summary judgment, however, and the Superior Court did not address this allegation in its order.

claim for waste.[3]  Mr. Nelbach, by then represented by counsel, opposed Ms. Nelbach's motion in November 2021.  In addition to arguing that the "history of [his] tax payment . . . , the current tax balance, and the imminence of a tax sale" were all material facts in dispute,[4] he asserted that there was no law to support Ms. Nelbach's claim that "a delay in paying taxes constitutes waste" and that waste only refers to "an unreasonable or improper use of land."  Ms. Nelbach filed a reply both indicating that the law was clearly in her favor because Mr. Nelbach, as the life tenant, unquestionably had an obligation to pay property taxes and arguing that Mr. Nelbach had failed to cite any case law to support his argument that his tax arrearage did *not* constitute waste.  Both parties attached materials to their pleadings reflecting they had made additional tax payments since the commencement of the suit.

The Superior Court granted Ms. Nelbach summary judgment.  First, the court concluded there were no genuine issues of material fact raised by the record.  The Superior Court credited Ms. Nelbach's assertion that she had made the $5,600

---

[3] By this time, the Council of the District of Columbia had enacted emergency legislation due to the ongoing effects of the Covid-19 pandemic, exempting all occupied real property from the annual tax sale for 2021.  D.C. Act 24-123, 68 D.C. Reg. 7337 (July 30, 2021).  The Council had previously canceled the tax sale for 2020 outright.  D.C. Act 23-383, 67 D.C. Reg. 9868 (Aug. 21, 2020).

[4] As an exhibit to his opposition to Ms. Nelbach's motion for summary judgment, Mr. Nelbach attached a letter he had received from the District confirming that his property would not be included in the 2021 tax sale.

payment in May 2021 to "avoid a tax foreclosure sale . . . because the District of Columbia had threatened to sell the Property," the tax sale exemption for occupied properties notwithstanding. See *supra* notes 3-4. Addressing Mr. Nelbach's argument that he too had made payments to address the arrearage, the court noted one August 2021 payment made by Ms. Nelbach for which Mr. Nelbach had inaccurately claimed credit—but did not acknowledge the uncontroverted record evidence of other payments apparently made by Mr. Nelbach. And the court dismissed the contested amount of outstanding tax liabilities as immaterial because a "balance of any outstanding tax liabilities against the Property threatens the value and nature of [Ms. Nelbach's] remainder interest."

Based on these findings, the Superior Court concluded that Mr. Nelbach was liable for waste under D.C. Code § 42-1601.[5] Echoing Ms. Nelbach's argument, the court relied on the fact that Mr. Nelbach had a well-established obligation to pay the taxes on the property. The court further reasoned that "the current unpaid tax obligation operates as a lien against the Property," which "affects and diminishes

---

[5] Ms. Nelbach's pleadings before the Superior Court, the Superior Court's order, and Mr. Nelbach's brief to this court all additionally cite D.C. Code § 42-1603. But this statutory provision addresses the cause of action for waste where the life tenant has assigned their interest to another, a situation not present in this case. Accordingly, we do not engage with this provision here.

[Ms. Nelbach's] remainder interest," and that Ms. Nelbach was "not required to suffer a complete loss of her title prior to taking actions to protect" her interest from "adverse consequences (i.e., tax liens, additional interest and penalties, and tax foreclosure sales)." The court awarded Ms. Nelbach treble damages in the amount of $23,580.03[6] plus costs and voided Mr. Nelbach's interest such that Ms. Nelbach obtained the fee simple title to the property.

## II.    Analysis

This case presents a question of statutory interpretation. Our review of the Superior Court's interpretation of a statute is de novo, as is our review of a grant of summary judgment. *District of Columbia v. Place*, 892 A.2d 1108, 1110-11 (D.C. 2006).

---

[6] Earlier in the order the Superior Court stated Mr. Nelbach was liable to Ms. Nelbach in the amount of $24,449.52. The court did not explain how it calculated either this amount or the $23,580.03 it ultimately awarded in damages. The latter figure matches the amount Ms. Nelbach requested in her summary judgment motion, calculated as triple the sum of the $5,600.00 tax payment she made in May 2021 and the $2,260.01 she represented was outstanding on the tax bill as of August 2021. As noted above, however, the amount Mr. Nelbach paid toward the arrearage was contested and the record does not reflect the amount the property was in arrears at the time the court ruled.

Generally, "[o]ur first step when interpreting a statute" is to examine its text, because "[t]he primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language [they have] used." *Id.* at 1111 (internal quotation marks omitted). In conducting this examination, "[i]t is axiomatic that the words of the statute should be construed according to their ordinary sense and with the meaning commonly attributed to them." *Id.* (internal quotation marks omitted). But what if, as is the case here, the statute we are analyzing was imported from a different place and time and was first recorded in another language, before the existence of the District and its Council,[7] or the United States,[8] or even the invention of the Western printing press[9] and the advent of a standard written English?[10] In

---

[7] Congress formally organized the District of Columbia by enacting the District of Columbia Organic Act of 1801, 2 Stat. 103, but the D.C. Council was not established until 1973 by the District of Columbia Self-Government and Governmental Reorganization Act, Pub. L. 93-198, 87 Stat. 774.

[8] The American colonies declared their independence in 1776, and the Constitution of the United States became operational in 1789. *U.S. Founding Documents*, Congress.gov, https://www.congress.gov/founding-documents; https://perma.cc/XT95-RWE9 (last visited Mar. 8, 2023).

[9] Johann Gutenberg is credited with inventing a movable-type printing press around 1450, although similar technology had been in use in China for hundreds of years prior. *See generally* Shelton A. Gunaratne, *Paper, Printing and the Printing Press: A Horizontally Integrative Macrohistory Analysis*, 63 Int'l Commc'ns Gazette 459 (2001).

[10] *See* David Saunders, *Literacy and the Common Law: A Polytechnical Approach to the History of Writings of the Law*, 11 Griffith L. Rev. 67, 77 (2002) (explaining that a standard written English did not cohere until the 1400s).

such an unusual circumstance, we cannot understand the meaning of the text without first examining its source.

## A.     The Statute of Gloucester

The archaic phrasing of the District's statute authorizing a claim for waste, D.C. Code § 42-1601, boasts an essentially unbroken lineage back to 1278 and the Statute of Gloucester.  In relevant part, the Statute of Gloucester states:

> It is provided also, That a Man from henceforth shall have a Writ of Waste in the Chancery against him that holdeth by Law of *England*, or otherwise for Term of Life, or for Term of Years, or a Woman in Dower. . . . And he which shall be attainted of Waste, shall leese the Thing that he hath wasted, and moreover shall recompense thrice so much as the Waste shall be taxed at.

6 Edw. 1 c. 5 (1278).[11]  Among the very first statutes enacted in England, the Statute is understood to have been written by Edward I and his advisers, as neither

---

[11] This translation, which the Council of the District of Columbia refers to in its legislative history for D.C. Code § 42-1601, is apparently attributable to a compilation of English statutes published in Britain in 1763.  1 Owen Ruffhead, *The Statutes at Large: From Magna Charta, to the End of the Last Parliament, 1761*, at 66 (London, Mark Basket et al. 1763), https://archive.org/details/statutesatlargef01grea/page/66/mode/2up; https://perma.cc/3C3G-KL92.   Other early translations are substantively similar, with minor stylistic differences. *See, e.g.*, 1 *Statutes of the Realm* 48 (Dawsons of Pall Mall 1963) (1810-1828), https://babel.hathitrust.org/cgi/pt?id=pst.000017915496&view=1up&seq=228; https://perma.cc/9CUY-FFC5.

Parliament nor any other body was yet in the business of drafting legislation.[12] It was penned in a time and place in which feudalism ordered society,[13] the economy was overwhelmingly agrarian,[14] the crown did not tax real property,[15] and the core value of real property was the land itself.[16] The need for the Statute of Gloucester arose out of a system where different people could have possessory interests in the same parcel of land.[17] The Statute addressed the circumstance when a present possessory interest arose as a matter of law via inheritance; relying on the concept of waste, the Statute protected any future possessory interests.[18] The Statute did not

---

[12] Nathan Isaacs, *The Statutes of Edward I—Their Relation to Finance and Administration*, 19 Mich. L. Rev. 804, 806 (1921).

[13] *See* Morton Gitelman, *The Impact of the Statute of Gloucester on the Development of the American Law of Waste*, 39 Ark. L. Rev. 669, 670 (1986).

[14] Nigel Saul, *A Companion to Medieval England, 1066-1485*, at 7-9 (2000).

[15] *Id.* at 199-201 (explaining that the king instead levied "moveables," referring to moveable property, and imports and exports during this time); *see also* Isaacs, *supra* note 12, at 811 ("Taxation in any modern sense was still to be invented.").

[16] *See Javins v. First Nat'l Realty Corp.*, 428 F.2d 1071, 1077-78 (D.C. Cir. 1970) ("These historical facts [of agrarian economy and the importance of the land] were the basis on which the common law constructed its rule; they also provided the necessary prerequisites for its application.").

[17] *See* Gitelman, *supra* note 13, at 670-71.

[18] *Id.* A different statute, the Statute of Marlborough, enacted 11 years before the Statute of Gloucester, protected landowners who leased their property to tenant farmers by making the statutory default that these tenants, absent express agreement, were responsible for the care of the land, its fixtures, and improvements and liable for damages for "waste" of the same. *Id.* at 671-72. Like the Statute of Gloucester, the Statute of Marlborough is fossilized in the District's Code. *See* D.C. Code § 42-

define what constituted waste, apparently deferring to existing understandings in the common law.[19] This common law reflected concern about conduct that caused physical damage, such as cutting down trees, failing to repair buildings, or allowing ponds to go dry.[20] An action for waste under the statute was a powerful remedy because it accelerated the end of the estate for life or years and facilitated the calculation of damages; its "inflexible and drastic character" likely had some deterrent value.[21] In short, the existence of an action for waste was meant to keep "in balance the conflicting desires of persons having interests in the same land and preserve[] the land for future possessors." 8 Michael Allan Wolf, *Powell on Real Property* § 56.01 (2022) [hereinafter *Powell*].

Centuries after the Statute of Gloucester came into being, the great majority

---

1602 ("Fermors, during their terms, shall not make waste, sale or exile of house or woods, nor of anything belonging to the tenements, that they have to ferm, without special license had by writing of covenant, making mention that they may do it; which thing if they do, and thereof be convict, they shall yield full damage and shall be punished by amercement grievously.").

[19] *See* Gitelman, *supra* note 13, at 684 (quoting 5 R. Powell, *The Law of Real Property* § 637 (1985)).

[20] George W. Kirchwey, *Liability for Waste*, 8 Colum. L. Rev. 425, 435 (1908).

[21] *Id.* at 433-34. The Statute was enacted before "the development of the injunction in the chancery court." Gitelman, *supra* note 13, at 674. After injunctive relief became available, an injured remainderperson could seek to enjoin future waste instead of seeking forfeiture and treble damages after the fact. *Id.*

of states of the United States "received" the law of England as a basis for their own legal systems. Gitelman, *supra* note 13, at 676-77. There is some scholarly disagreement as to whether the states in fact ever widely "received" the Statute of Gloucester itself, *see id.* at 682-85, but regardless of formal provenance all 50 states provide actions for waste, *see Powell* § 56.11. Over the years, however, there has been widespread recognition that "[t]he traditional law of waste, formulated in a largely static agricultural society," is "ill-suited" to "current social and economic . . . conditions." *See Powell* § 56.05[1][c]. Accordingly, other jurisdictions in the United States have significantly modified (and moderated) this cause of action, either by legislation or court decision. *See id.* § 56.11. As discussed in more detail below, the District of Columbia appears to be the sole jurisdiction in the United States that has substantially preserved the Statute of Gloucester in its original (albeit translated) form[22]—notable particularly because England itself repealed the Statute in 1879.[23]

The Statute of Gloucester first appeared in the District's *Compiled Statutes*

---

[22] Two states, Kentucky and Missouri, have waste statutes that reflect the substance of the Statute of Gloucester, but have at least been reworded into more modern language. Ky. Rev. Stat. Ann. § 381.350 (West 2023); Mo. Rev. Stat. § 537.420 (2023).

[23] Civil Procedure Acts Repeal Act, 42 & 43 Vict. c. 59.

published in the late 1800s (at that time curiously retaining even the references to the "law of England" and, in related statutes, to "our lord the King")[24] and has been contained in every iteration of the District's written laws thereafter. The District formally adopted the Statute in its 1901 codification, which incorporated the English common law as it was incorporated in the common law of Maryland.[25] As the decades passed, the Statute of Gloucester remained in the D.C. Code almost entirely without alteration, despite commentators recognizing that "[c]omprehension of this historical statutory language is often extraordinarily difficult due to the convoluted phraseology" employed. *See* Clarke, *supra* note 25, at 1321-23. In the last 50 years, the Council has amended the statute twice, with the cumulative effect of deleting the phrase "or a woman in dower." D.C. Law 1-87, § 41, 23 D.C. Reg. 2544 (Oct. 1, 1976) (deleting "a woman"); D.C. Law 13-292, § 804, 48 D.C. Reg. 2087 (Apr. 27, 2001) (deleting "or in dower"). In its current form, D.C. Code § 42-1601 states:

> A man from henceforth shall have a writ of waste in the chancery against him that holdeth by law, or otherwise for term of life, or for term of years; and he which shall be attainted of waste, shall lease the thing that he hath wasted, and moreover shall recompense thrice so much as the waste shall be taxed at.

---

[24] *The Compiled Statutes in Force in the District of Columbia, Including the Acts of the Second Session of the Fiftieth Congress, 1887-'89*, at 319 (1894).

[25] *See Thruston v. Mustin*, 3 D.C. (3 Cranch) 335 (D.C. Cir. 1828); Catherine T. Clarke, *A Survey of the District of Columbia Law Revision Commission*, 34 Cath. U. L. Rev. 1309, 1321 & nn.73 & 80 (1985).

The remaining language is still antiquated and requires translation. In addition to suggesting that actions for waste may only be brought by and against men, the directive that a waste action is to be had "in the chancery" is purely a vestige, as no such body has ever operated in the District.[26] And the consequence that the defendant to an action for waste "shall lease" the property means that they "shall lose" it, not that they shall be required to pay rent.[27]

## B. Defining "Waste" Generally

As the Statute of Gloucester implies, "waste" at its most general conception refers to the incidence of some injury to property, attributable to a tenant (of years or for life via gift or inheritance) and to the detriment of another's future interest in that property—as relevant here, the holder of the remainder interest. In 13th-century England, this injury was understood to be physical and nonephemeral in nature, see

---

[26] *See Powell* § 56.02 (explaining that the "Chancery" referred to in the original Statute was the king's secretarial bureau). *See generally* Saul, *supra* note 14, at 90 (detailing the administrative functions of the chancery, which was staffed by "clerks of the royal chapel").

[27] This understanding is made evident in the original Ruffhead translation, see *supra* note 11, which provides that the defendant shall "leese" the wasted property, an obsolete version of "lose," *see Leese*, Merriam-Webster, https://www.merriam-webster.com/dictionary/leese'; https://perma.cc/93CY-BANJ (last visited Feb. 23, 2023).

*supra*, and this understanding crossed the pond. For example, American courts have found "waste" where a tenant physically destroyed the property's resources, *see, e.g.*, *Thruston v. Mustin*, 3 D.C. (3 Cranch) 335 (D.C. Cir. 1828) (holding that, where the "principal value of the farm consists in the wood," "the cutting and selling of [the] young and green wood [on the farm] was an injury to the inheritance" amounting to waste), or failed to maintain a property such that it suffered significant physical deterioration, *see, e.g.*, *Fisher's Ex'r v. Haney*, 202 S.W. 495, 497 (Ky. 1918) (affirming a determination that a tenant committed waste of a farm where "he took no pains to keep it in repair, or to save it from going to ruin").

But outside of this core grounding in physical, lasting damage, the outer bounds of what qualifies as waste are less well defined. Legal authorities defining the concept of waste variously describe the extent and nature of the injury required. *Black's Law Dictionary* defines "waste" as "[p]ermanent harm to real property committed by a tenant (for life or for years) to the prejudice of . . . the remainderman." *Waste*, *Black's Law Dictionary* (11th ed. 2019). *Powell on Property*, to which Ms. Nelbach cites, defines "waste" as "the destruction, alteration, misuse, or neglect of property by one in rightful possession to the detriment of another's interest in the same property." *Powell* § 56.01. *Corpus Juris Secundum*, to which Mr. Nelbach cites, describes the requisite injury as "permanent,"

"material," "lasting," or "substantial." 93 C.J.S. *Waste* § 1 (Supp. 2023).

This court and its predecessors have not set out or adopted a comprehensive definition of "waste," but consistent with the authorities discussed, "waste" under District law conceives of a level of harm to the property that is substantial and lasting enough to damage a future interest in the property. We have held in general terms that "[w]aste is an act done to the injury of the inheritance." *Thruston*, 3 D.C. (3 Cranch) 335. We have said that waste may arise where the tenant has failed in multiple respects to maintain the physical condition of the property, "evidencing a wanton disregard of the [future interest holder's] rights." *Klein v. Longo*, 34 A.2d 359, 360 (D.C. 1943) (construing a party's allegation that the tenant "has suffered and permitted the property to deteriorate unreasonably and become uninhabitable" as a charge of waste). And we have also said that "direct pecuniary loss for which the law can furnish no adequate or complete redress" is an "irreparable injury" analogous to "actual waste," and that the prevention of such injury merits the equitable remedy of the appointment of a receiver for the property. *Whyte v. Spransy*, 19 App. D.C. 450, 461 (D.C. Cir. 1902).

### C. Tax Arrears and Waste

With this backdrop, we consider the nature of the harm caused by a tax arrearage and how tax arrearages are treated under other states' waste statutes.

Preliminarily, we reaffirm the principle that a life tenant has a duty to pay property taxes while the property is in their possession. *Elliot v. Lamon*, 8 D.C. (1 MacArth.) 647, 650 (D.C. 1874); *accord Stansbury v. Inglehart*, 20 D.C. (9 Mackey) 134, 145 (D.C. 1889). When a person fails to pay the entirety of taxes owed on their real property in the District, the unpaid tax "automatically become[s] a lien" on the property. D.C. Code § 47-1331(a). But this lien does not in turn automatically lead to a taking of the property. Rather, should the taxes remain unpaid, a rigorous and time-bound series of procedural steps, mandated by statute, must be taken before ownership of a property can be transferred to a new owner through a tax sale.[28] And at every stage of this process up until the foreclosure is final, those with an existing interest in the subject property have the opportunity to redeem the property and rescue their interest. *See generally id.* §§ 47-1360 to -1366.

---

[28] By statute, the District holds an annual tax sale in the form of a public auction on the third Tuesday in July, D.C. Code §§ 47-1301(b)(3), -1346, barring any legislation to the contrary, see *supra* note 3.

We discuss the D.C. Code's tax foreclosure provisions in some detail to illustrate the scope of their protections.  As noted above, for developed residential property the tax arrearage must amount to at least $2,500 for the property to be eligible for tax sale.  *Id.* § 47-1332(c)(2).  If the arrearage is above that statutory limit, then the District must issue at least two notices of delinquency to the owner or owners of record: one on or before May 1, and another at least two weeks before the property is offered at a tax sale.  *Id.* §§ 47-1341(a)(1), (b-1)(1).  Someone with an ownership interest in the property can apply for forbearance of the tax sale, which must be approved if certain hardships are present and otherwise may be approved at the Mayor's discretion.  *Id.* § 47-1332(e).  If an interested party pays the noticed delinquent amount at any time before the tax sale, then the District must cancel sale of that property.  *Id.* § 47-1366(b)(1).  Additional protections adhere where the property in question is a residential property with five or fewer units in which an interest holder lives as their primary residence.  *See id.* § 47-1366(b)(3).

If the tax liability remains at least $2,500 and no forbearance has been granted, the property may then be sold at the public tax sale, *see generally id.* § 47-1346, after which the District is again required to send notice to the owner or owners of record within 30 days, *id.* § 47-1353.01(a).  But such a sale still does not terminate existing interests in the property: any interest-holder may redeem the property by paying off

the arrears, plus interest, within six months of the sale. *Id.* § 47-1306(a). Once the six-month "waiting period" has elapsed, if the purchaser of the property wishes to foreclose all existing interest-holders' right of redemption, they must file a complaint in Superior Court. *Id.* § 47-1370(a). The purchaser must name any life tenants or holders of remainder interests as defendants in their foreclosure action. *Id.* § 47-1371(b)(1)(C)-(D). The purchaser is also required to send written notice of the action to "all persons having a recorded interest" in the property. *Id.* § 47-1372(a)(1)(A). The named defendants then have the opportunity to answer the complaint by pleading any applicable affirmative defenses. *See id.* § 47-1376. The existing owner or owners retain the right of redemption up until a judgment foreclosing that right becomes final, *id.* § 47-1370(d), so long as they also reimburse certain expenses to the purchaser, which generally increase the further along the foreclosure action has proceeded, *see id.* § 47-1377.

In sum, any person holding an interest in a property potentially subject to tax sale retains the ability to redeem the property from the issuance of the first notice of delinquency until the foreclosure judgment becomes final. And no fewer than eight months must pass between that first notice and the *initiation* of foreclosure proceedings. Lastly, although the cost of redemption increases throughout the foreclosure process, expenditures related to redemption do not inflict irreversible

injury on or devalue the property itself or anyone's interest therein.

In the absence of any case law on point in the District regarding tax arrearages and waste, the parties to this appeal have directed us to precedent from other jurisdictions. The parties have given us no information about the procedures for the recovery of unpaid property taxes in these jurisdictions. Moreover, as noted above, no state has a waste statute like the District's. See *supra* Section II.A. With these caveats, we observe that the great weight of outside authority reveals a general agreement that the bare showing of any amount of tax arrearage alone cannot support a traditional action for waste and its attendant remedies.

As noted above, every state recognizes an action for waste, but the vast majority have significantly moderated the application of its traditional, "drastic" remedies. Only 19 authorize forfeiture of the property interest as a remedy for waste, only 18 authorize triple damages, and even fewer authorize the one-two punch of both remedies.[29] Focusing specifically on the states that still authorize forfeiture, arguably the harshest consequence, some state courts have rejected the conclusion

---

[29] *See Powell* § 56.11 nn.5 & 9. *Powell* further notes that, in those states authorizing multiple damages, "there are evidences of the dislike" for that remedy. *Id.* § 56.11.

that unpaid taxes might be classified as waste;[30] some states require by statute that any injury to the remainder interest be attributable to malice or at least amount to a significant proportion of the property's value before permitting forfeiture for waste;[31] some state courts have deemed unpaid taxes to be waste only where the nonpayment actually resulted in a recorded taking of the property;[32] and other state courts have exercised discretion to provide remedies of damages, injunctive relief, or the appointment of a receiver where taxes have been delinquent.[33] We can

---

[30] *See, e.g.*, *Reniere v. Gerlach*, 752 A.2d 480, 483-84 (R.I. 2000) (rejecting waste for failure to pay taxes where the remainderman paid off the taxes due); *cf. Camden Tr. Co. v. Handle*, 26 A.2d 865, 869, 872 (N.J. 1942) (rejecting waste for failure to pay taxes in the mortgage context); *Farm Mortg. Loan Co. v. Pettet*, 200 N.W. 497, 500 (N.D. 1924) (same).

[31] *See, e.g.*, Alaska Stat. § 09.45.740 (2022); Ind. Code § 32-30-4-1(b) (2022); Iowa Code § 658.2 (2022); Minn. Stat. § 561.17 (2022); N.Y. Real Prop. Acts. Law § 815 (McKinney 2022); Or. Rev. Stat. § 105.805 (2021); S.D. Codified Laws § 21-7-2 (2023); Wash. Rev. Code § 64.12.020 (2022).

[32] *See, e.g.*, *Reel v. Reel*, 23 N.E.3d 309, 312-13 (Ohio Ct. App. 2014) (citing Ohio Rev. Code Ann. § 323.44, which only authorizes forfeiture for failure to pay taxes when a property has been sold and not timely redeemed); *Thayer v. Shorey*, 191 N.E. 435, 436-37 (Mass. 1934) (affirming judgment of waste against a life tenant who "suffer[ed] the estate to be sold for nonpayment" of property taxes); *Garland v. Garland*, 73 Me. 97, 99 (1881) (permitting action of waste where the life tenant's failure to pay property taxes "subjects the estate to a sale").

[33] *See, e.g.*, *Beliveau v. Beliveau*, 14 N.W.2d 360, 365-67 (Minn. 1944) (underscoring the "flexibility and expansiveness" of equity that permitted the court to appoint a trustee for the property wasted); *In re Stein's Will*, 91 N.Y.S.2d 158, 163-64 (Sur. Ct. 1949) (declining to "turn over" the property to the remainderman where he did not pursue other available remedies for waste); *cf. Abernathy v. Orton*, 71 P. 327, 328-30 (Or. 1903) (affirming the award of compensatory damages and

identify only two states, Kentucky and Georgia, in which courts have held forfeiture was authorized where waste was alleged under circumstances similar to those presented here—i.e., with outstanding tax liabilities that have not yet yielded a recorded or actual taking of the property, with no showing of malice or an arrearage that was a significant percentage of the market value of the property.[34] But Kentucky has only made this pronouncement in an unpublished decision from an intermediate appellate court, and though Georgia's highest court has reaffirmed this interpretation of its waste statute (which does not authorize treble damages) in a number of opinions, little is provided in the way of supporting analysis for the extension of the doctrine of waste to these circumstances.

### D.    Application to the Nelbachs' Property

Turning to the issue presented in this case, we consider whether Mr. Nelbach's

---

the appointment of a receiver where the remainderman paid property taxes to avoid sale of the property).

[34] *See McIntyre v. Scarbrough*, 471 S.E.2d 199, 201 (Ga. 1996) (collecting cases); *Springfield v. Springfield*, No. 2021-CA-0358-MR, 2022 WL 16841998, at *3-4 (Ky. Ct. App. Nov. 10, 2022). Ms. Nelbach cites to decisions from states other than Georgia and Kentucky for the proposition that a failure to pay property taxes is waste, but for the reasons discussed above, none directly parallel the statutory and factual circumstances surrounding her claim.

tax arrearage was actionable waste. We conclude it was not. We hold instead that, where a life tenant permits a property in the District to fall into tax arrears, the existence of the tax liabilities, the attachment of the associated lien, and the issuance of a notice of delinquency regarding those liabilities do not support an action for waste either individually or collectively under D.C. Code § 42-1601.[35]

Regardless of the precise definition used, it is clear that "waste" in the context of D.C. Code § 42-1601 must involve, at the least, some detrimental, lasting injury to the property that compromises the remainder interest. See *supra* Section II.B. We do not discern such an injury on this record.

The Superior Court concluded that a "balance of any outstanding tax liabilities against the Property threatens the value and nature of [Ms. Nelbach's] remainder interest" such that Mr. Nelbach committed waste as a matter of law. We disagree that the mere existence of unpaid taxes can constitute waste under the District's

---

[35] The parties devoted much of their briefs to arguments concerning whether the District's waste statute is properly construed to cover "permissive" waste or only "voluntary" waste. Because our holding turns on the tax-based nature of the alleged waste, we need not and do not consider this distinction. Similarly, because we find there is not an action for waste in this case, we need not and do not consider the parties' arguments regarding the mandatory or discretionary nature of the statutory remedies.

statute. To begin with, as our preceding discussion makes clear, no historical understanding of waste encompassing unpaid property taxes was imported with the plain text of the Statute of Gloucester; it could not have been, given that the statute was drafted at a time when the government did not levy such taxes. Second, the severity of the remedies afforded by the Statute indicate the seriousness of the actually-incurred injury to be remedied. Although outstanding tax liabilities may eventually lead to the imperilment of the remainder interest should a series of conditions be met as explained *supra* Section II.C, the nonpayment of the full balance of a property's real estate taxes alone does not so threaten or injure the remainder interest such that it merits that the tenant pay triple damages and lose their interest in the property outright. Rather, as soon as any interest-holder pays the taxes due, whatever "damage" to the underlying interest that had been inflicted is redressed in full.[36] We are unpersuaded that the District intended to make available the drastic consequences contained in its waste statute each and every time one cent

---

[36] This is not to say that, should the holder of the remainder interest make payment on the property's tax liabilities that the life tenant was obligated to pay, the holder of the remainder interest is without legal recourse to recover the amount of that payment from the life tenant. *Cf. Elliot v. Lamon*, 8 D.C. (1 MacArth.) 647, 649-50 (D.C. 1874) (affirming injunction against a life tenant to pay his delinquent property taxes where the delinquency would require the sale of the property should the delinquency continue); *Abernathy*, 71 P. at 329-30 (see *supra* note 33). But we need not address the nature and extent of that recourse in this opinion, as Ms. Nelbach asserted waste and no other cause of action against Mr. Nelbach.

is missing from a tax payment. While the failure to pay property taxes timely and in full may breach the life tenant's duty to the holder of the remainder interest, it cannot reasonably be considered analogous to the devastation of a property's natural resources or the utter dilapidation of its improvements—injuries that more plausibly justify the harsh remedies that flow from a traditional determination of waste.

The Superior Court also indicated that the lien flowing from the arrearage was sufficient to count as the requisite waste, and Ms. Nelbach defended this reasoning in her brief, arguing that the "continuing lien" resulting from the unpaid taxes "substantially impaired the value of [her] interest" because the lien "may be enforced against [her] interest." But she abandoned this assertion at oral argument, and rightly so. Given that a lien is resolved as soon as the taxes are paid off, any threat or damage to the remainder interest is far too minimal and attenuated to meet that threshold. Moreover, because per D.C. Code § 47-1331(a) the attachment of such a lien is automatic "on the date the [property] tax was due and unpaid," apparently regardless of the arrearage's amount, to hold that the mere existence of a lien justifies a finding of waste would be effectively equivalent to holding that the mere existence of any tax liability is waste. This seems especially disproportionate, and thus out of step with the original aim of this statute to balance the interests of the tenant for life or years and the remainderperson, where the amount of the lien comes nowhere near

the value of the property. We thus reject the proposition that the mere existence of a tax lien constitutes waste.

Lastly, Ms. Nelbach appears to argue in her brief and expressly asserted at oral argument that, once the District issued a notice of delinquency regarding the property taxes, the threat to her interest was sufficiently grave so as to merit a finding of waste as a matter of law. But this notice only indicated the *possibility* of future foreclosure of the property via tax sale—it had no effect whatsoever on the remainder interest (or on any interest in the property). And as related above, there exist extensive opportunities after the first notice of delinquency is issued to redeem the property and rescue the remainder interest. Indeed, the potential for any damage to Ms. Nelbach's interest was even more remote than it would be for a typical tax arrearage because there was no possibility that the property would actually be sold at a tax sale in 2021. See *supra* notes 3-4.[37] The fact that Ms. Nelbach was subjectively alarmed by the notice such that she made a payment on the tax liabilities does not change our analysis on the specific question of waste. The Superior Court reasoned, and Ms. Nelbach reiterates, that she should not have been bound to wait

---

[37] Given the extent of the redemption procedures that the District has put in place to protect property owners' interests before foreclosure, we have reasons to doubt that waste would have occurred under our statute even if the property had been sold at tax sale.

until the property was lost before seeking relief. It may well be that she could have sought injunctive or other relief. See *supra* note 36. But we are unpersuaded that a speculative potential loss of the property is properly addressed by a preemptive action for waste yielding the drastic remedies of D.C. Code § 42-1601.

Because none of the circumstances presented in this case reflects the extent of damage to the remainder interest so as to amount to "waste" under D.C. Code § 42-1601 as we interpret that statutory term, we conclude that the trial court erred in granting Ms. Nelbach judgment as a matter of law.

## III.    Conclusion

For the foregoing reasons, we vacate the order of the Superior Court granting Ms. Nelbach summary judgment and remand for further proceedings consistent with this opinion.

*So ordered*.